**HARRIS GROUP, INC., a Washington corporation, Plaintiff–Appellee and Cross–Appellant,**

v.

**Michael S. ROBINSON, Robert D. Courtney, Jon E. Neff, and Luminate, L.L.C., a Colorado limited liability company, Defendants–Appellants and Cross–Appellees.**

No. 07CA1803.

Colorado Court of Appeals, Div. VI.

March 5, 2009.

Rehearing Denied May 14, 2009.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2008.

1192

 

Hale Friesen, LLP, Daniel E. Friesen, Peter J. Krumolz, Christine K. Lamb, Denver, Colorado, for Plaintiff–Appellee and Cross–Appellant.

Appel & Lucas, P.C., Peter J. Lucas, Denver, Colorado, for Defendants–Appellants and Cross–Appellees Michael S. Robinson, Robert D. Courtney, and Jon E. Neff.

Rothgerber Johnson & Lyons, LLP, Michael D. Plachy, Alex C. Myers, Miro Kovacevic, Denver, Colorado, for Defendant–Appellant and Cross–Appellee Luminate, L.L.C.

Opinion by Judge BERNARD.

Defendants, Luminate, L.L.C. (the new business) and Michael S. Robinson, Jon E. Neff and Robert D. Courtney (the former employees), appeal the trial court's judgment entered on a jury verdict finding them liable to plaintiff, Harris Group, Inc. (the company), for breach of their confidentiality agreement, and for the torts of conversion, breach of fiduciary duty, and intentional interference with contract. The trial court also entered a judgment for damages for unjust enrichment, as recommended by the jury in its advisory verdict. We affirm the judgment in part, reverse it in part, and remand the case to the trial court for further proceedings consistent with this opinion.

## I. Background

The company was an engineering firm with a department specializing in consulting with banks and other lenders that provide financing for the building of ethanol and power plants. The former employees worked in that department.

In early 2006, the former employees began to develop plans and make arrangements to open a new business. Over the course of several weeks, they took inventory of the company's clients and projects to determine which ones they would take with them when they resigned. They leased office space and obtained liability insurance.

The former employees copied the company's files, and e-mailed them or saved them so that the files could be used later at the new company. The original files were deleted after they were copied.

The former employees developed a website, which included the announcement that one of the former employees had left the company to join the new business, "tak[ing] along [the company's] entire ... Consulting Team." The former employee mentioned in the website announcement drafted another announcement to be sent to some of the company's clients, which stated, "[M]y entire consulting services team and I have spun off [from the company] and joined [the new business], a newly formed management and technical consulting firm."

Five days later, near the end of April 2006, the former employees resigned from the company, giving one day's notice. Upon their resignation from the company, the former employees extended job offers to five of the seven workers (the other employees) who remained in the financial consulting department. All five of the other employees accepted the offers, resigned from the company, and went to work for the new business.

During the new business's first week in early May 2006, the former employees contacted the company's clients. The former employees told the clients that they could arrange for the new business to take over their projects. They e-mailed the clients a form letter that they could use to terminate their business relationships with the company. Consequently, the clients transferred seventeen of twenty-nine active projects from the company to the new business.

In May 2006, the company filed suit against the new business, the former employees, and four of the five other employees. The suit sought relief for lost profits and damages, raising a variety of claims: computer fraud and abuse; conversion; civil theft; misappropriation of trade secrets; breach of confidentiality agreements; breach of fiduciary duty; defamation; intentional interference with contract; intentional interference with prospective business relations; civil conspiracy; fraud; and unjust enrichment. The other employees are not parties to this appeal.

Before trial, the company voluntarily dismissed the claims alleging that the former employees had engaged in computer fraud and abuse and had defamed the company.

During the trial, the court entered a directed verdict in favor of the former employees on the company's claims of civil theft and misappropriation of trade secrets. The rest of the company's claims were submitted to the jury, and the trial court ordered that the verdict on the unjust enrichment claim would be advisory.

The jury found that the company had proved the following claims against the new business: intentional interference with a contract; conversion; and unjust enrichment. The verdict also found that the company had proved the following claims against the former employees: breach of confidentiality agreements; breach of fiduciary duty; intentional interference with contract; conversion; and unjust enrichment. The jury found that the company did not prove the claims of fraud; intentional interference with prospective business relations; and conspiracy.

The jury awarded the company $1,929,500 in actual damages assessed against the former employees and the new business, including an award of $205,000 as the advisory verdict for unjust enrichment. The jury also awarded the company $630,550 in punitive damages.

## II. Instructions

The former employees and the new business contend that the trial court erroneously instructed the jury in two ways. First, the former employees and the new business argue that the instruction concerning the affirmative defense of the business competition privilege was misleading, circular, and prejudicial because it referred to wrongful means that (1) were not at issue in the case; (2) were rejected by the jury; and (3) included the same tort—intentional interference with a contract—to which the defense applied. Although we agree that the instruction was erroneous, we conclude that the error was harmless.

Second, the former employees and the new business contend that the instruction on punitive damages read and given to the jury omitted a part that had been approved during the instructions conference. Specifically, the instruction excluded a description of the

purpose of punitive damages. Because the former employees and the new business did not raise this objection below, we shall not review it.

### A. Standard of Review

■ Trial courts have discretion to determine the form and style of jury instructions. *Williams v. Chrysler Ins. Co.*, 928 P.2d 1375, 1377 (Colo.App.1996). We will not overturn such a determination absent a showing of an abuse of that discretion. *Id.* A court's ruling on jury instructions is an abuse of discretion only when the ruling is manifestly arbitrary, unreasonable, or unfair. *Id.* (citing *Hock v. N.Y. Life Ins. Co.*, 876 P.2d 1242, 1251 (Colo.1994)).

■ A court erroneously instructs the jury when the instruction at issue misleads or confuses the jury. *Id.* However, a court's erroneous instruction is reversible only when it prejudices a party's substantial rights. *Id.* If a jury probably would have decided a case differently if given a correct instruction, then the error is reversible. *Webb v. Dessert Seed Co.*, 718 P.2d 1057, 1066–67 (Colo.1986). Thus, we apply a harmless error standard of review to a properly preserved objection to a jury instruction. *Waneka v. Clyncke*, 134 P.3d 492, 494 (Colo.App.2005), *aff'd*, 157 P.3d 1072 (Colo.2007).

■ C.R.C.P. 51 requires parties to object to alleged errors in instructions before they are given to the jury. "Only the grounds so specified shall be considered ... on appeal...." *Id.* Alleged errors that are not objected to are waived. *Robinson v. City & County of Denver*, 30 P.3d 677, 684 (Colo. App.2000).

■ The former employees and the new company argue that we should apply the plain error standard when reviewing the trial court's instruction on punitive damages. Although the "plain error" doctrine has been employed in a few civil cases involving instructional error, *e.g.*, *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579, 586–87 (Colo.1984), the circumstances justifying its application in civil cases are rare. *Robinson*, 30 P.3d at 684–85. This is so because C.R.C.P. 51 warns counsel to raise objections to instruc-

tions; issues involving jury instructions, unlike some objections to evidence, do not arise without warning; a timely objection allows the court to correct errors that can be easily corrected; restricting the scope of plain error review in civil cases promotes orderliness and the finality of decisions; and trials, not appeals, are the core of the judicial system. Thus, plain error review of instructional issues is restricted to unusual or special cases, and, even then, reversal occurs only when necessary to avert unequivocal and manifest injustice. *Id.* For the reasons explained below, we decline to apply plain error review here.

### B. Business Competition Privilege Instruction

#### 1. Introduction

■ The tort of interference with existing or prospective contractual relations is an intentional tort. Restatement (Second) of Torts ch. 37 introductory note (1979) (the Special Note). According to Restatement section 767 comment a, this tort has three forms. Only one of these forms is at issue here, but we must discuss another form to provide an appropriate context for our analysis.

The first form occurs when a defendant causes a third party not to perform the terms of an existing contract with a plaintiff. It is defined by Restatement section 766:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

■ The second form occurs when a defendant interferes with a prospective business relation between a plaintiff and a third party. Its elements are listed in Restatement section 766B:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for

the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

In order to prove this form of the tort, it is not necessary to show that an underlying contract exists, but, rather, the plaintiff must show that intentional and improper interference prevented a contract from being formed. *Dolton v. Capitol Fed. Sav. & Loan Ass'n*, 642 P.2d 21, 23 (Colo.App.1981).

■ The goal to be achieved by these forms of the tort is to protect the integrity of contracts. *See Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo.1984). However, that interest is not absolute, and must be balanced against the interests of the parties and society. *Id.* These personal and social interests, which are described by the Restatement as "privileges," include the ability to engage in business and compete with others. *See* the Special Note ("[T]here are . . . a number of established privileges for the tort."); Restatement §§ 767 cmt. j & 768–774 (describing privileges); *Kutcher v. Zimmerman*, 87 Hawai'i 394, 403, 957 P.2d 1076, 1085 (Haw. Ct.App.1998).

■ Thus, to achieve the balance between protecting contracts and preserving privileges, a plaintiff must show more than that a defendant intentionally interfered with an existing contract or with prospective contractual relations. There must also be proof that such interference was "improper." Restatement § 767; *Mem'l Gardens*, 690 P.2d at 210; *Kutcher*, 87 Hawai'i at 403, 957 P.2d at 1085.

■ Generally, the factors to be considered when deciding whether interference was improper are listed in section 767. These factors require a fact finder to evaluate the interests of the parties and the interests of society as part of the process of deciding whether interference with a contract should result in a finding of liability. *Mem'l Gardens*, 690 P.2d at 210. Section 767 states:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

■ However, when the parties are business competitors, and the conduct in question involves intentional interference with prospective contractual relations or contracts terminable at will, the general factors outlined by section 767 do not apply. *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 501 (Colo. 1995); *Mem'l Gardens*, 690 P.2d at 210 n. 7; Restatement § 768. This is because

[o]ne's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in [section 768] entitles one not only to seek to divert business from his competitors generally but also from a particular competitor. And he may seek to do so directly by express inducement as well as indirectly by attractive offers of his own goods or services.

Section 768 cmt. b.

This privilege to engage in business and to compete

rests on the belief that competition is a necessary or desirable incident of free enterprise. Superiority of power in the matters relating to competition is believed to flow from superiority in efficiency and service. If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their

competition, he serves the purposes for which competition is encouraged.

Section 768 cmt. e.

█ Section 768 is specifically constructed to balance society's interest in free competition and a competitor's interest in free business activity against the relationship of parties to a prospective contract. *Mem'l Gardens,* 690 P.2d at 210 n. 7. This balance means that "greater protection is given to the interest in an existing contract than to the interest in acquiring prospective contractual relations, and as a result permissible interference is given a broader scope in the latter instance." Section 767 cmt. j; *Amoco Oil Co.,* 908 P.2d at 501.

█ This same analysis applies to contracts terminable at will. "A contract terminable at will is one that may be terminated at any time without legal consequence; that is, there is no breach if the contract is terminated." *Mem'l Gardens,* 690 P.2d at 212. The Restatement provides less protection for contracts terminable at will because interference with such contracts affects a "future expectancy, not a legal right." *Id.* at 211.

However, some interference is not permissible.

If [the actor] diverts the competitor's business by exerting a superior power in affairs unrelated to their competition there is no reason to suppose that his success is either due to or will result in superior efficiency or service and thus promote the interest that is the reason for encouraging competition. For this reason economic pressure on the third person in matters unrelated to the business in which the actor and the other compete is treated as an improper interference.

Section 768 cmt. e.

Thus, section 768 sets forth specific factors to be applied when analyzing whether a business competitor's intentional interference with prospective contractual relations or with contracts terminable at will is privileged or a tort.

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

 (a) the relation concerns a matter involved in the competition between the actor and the other and

 (b) the actor does not employ wrongful means and

 (c) his action does not create or continue an unlawful restraint of trade and

 (d) his purpose is at least in part to advance his interest in competing with the other.

(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

"Wrongful means" constitute impermissible interference with prospective contracts or contracts terminable at will.

If the actor employs wrongful means, he is not justified under the rule stated in this Section [768]. The predatory means discussed in § 767, Comment *c,* physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section. On the other hand, the actor may use persuasion and he may exert limited economic pressure.

Section 768 cmt. e.

Our supreme court has recognized that the definition of "wrongful means" is not open-ended. *Amoco Oil Co.,* 908 P.2d at 502. Indeed, in footnote 6 of *Amoco Oil Co.,* the supreme court cited cases from other jurisdictions that recognize the limited nature of the description in section 768 comment e. For example, "wrongful means" are those that are "intrinsically wrongful—that is, conduct which is itself capable of forming the basis for liability of the actor," *Amerinet, Inc. v. Xerox Corp.,* 972 F.2d 1483, 1507 (8th Cir.1992)(quoting *Conoco, Inc. v. Inman Oil Co.,* 774 F.2d 895, 907 (8th Cir.1985)); "illegal," *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 543 (7th Cir.1986); or

"wrongful by reason of a statute or other regulation, ... a recognized rule of common law, ... an established standard of a trade or profession," "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation or disparaging falsehood," *Downey Chiropractic Clinic v. Nampa Rest. Corp.*, 127 Idaho 283, 286, 900 P.2d 191, 194 (1995). *See also Occusafe, Inc. v. EG & G Rocky Flats, Inc.*, 54 F.3d 618, 622 (10th Cir.1995) (interpreting Colorado law and applying section 768 comment e, stating that "in the context of a claim for tortious interference with prospective economic advantage, 'wrongful means' refers to conduct such as 'physical violence, fraud, civil suits, and criminal prosecutions'" (quoting *R–G Denver, Ltd. v. First City Holdings*, 789 F.2d 1469, 1476 (10th Cir.1986))).

When analyzing Kansas law, the Tenth Circuit indicated that it viewed "wrongful means" similarly to the descriptions contained in footnote 6 of *Amoco Oil Co.* The federal court predicted that the Kansas Supreme Court would interpret the phrase "wrongful means" to require "independently actionable conduct." *DP–Tek, Inc. v. AT & T Global Info. Solutions Co.*, 100 F.3d 828, 833–35 (10th Cir.1996). Such conduct is, of itself, capable of establishing the basis of a defendant's liability. *Id.* at 834.

The procedures to be followed when this tort is at issue are not entirely clear. The Special Note states:

It is the defendant's responsibility to raise the applicability of a privilege and to assume the burden of proving the facts required to sustain it. In the process of balancing the conflicting interests of the parties, each party has the responsibility of raising and proving an allocated part of the case.

... [T]he defendant's liability for his conduct depends upon the interplay of a number of factors, and it is the responsibility of the plaintiff to raise these factors and sustain them by factual proof.

....

... [T]here is no clearcut distinction between the requirements for a prima facie case and the requirements for a recognized privilege. Initial liability depends upon the interplay of several factors and is not reducible to a single rule; and privileges, too, are not clearly established but depend upon a consideration of much the same factors. Moreover, there is considerable disagreement on who has the burden of pleading and proving certain matters, such, for example, as the existence and effect of competition for prospective business.

2. Analysis

The argument of the former employees and the new business focuses on the instructions that addressed contracts that were terminable at will. The company claims that the former employees were at-will employees, and that they and the new business "used wrongful means to interfere with [the company's] contracts and prospective business relationships with [the other employees] and clients."

Thus, the business competition privilege would apply to protect the former employees, after they left the company, and the new business from liability for intentional interference with those contracts, unless the factors listed in section 768 were established. Specifically, the issue before the jury was whether the former employees and the new business used wrongful means when they intentionally interfered with the contracts terminable at will.

Here, the jury was instructed that the former employees and the new business

may lose the business competition privilege if [they use] "wrongful means" of inducement, *for example:* fraud, intentional interference with contract, intentional interference with prospective business relations, physical violence, threats of criminal prosecution, or threats of civil suit.

(Emphasis added.)

The former employees and the new business contend that the list of wrongful means included in this instruction was misleading, circular, and prejudicial. The list was misleading because there was no evidence submitted to the jury to establish that some of the listed conduct—physical violence, threats of criminal prosecution, or threats of civil

suit—had occurred. The list was circular because it included conduct—intentional interference with contract—that was the tort to which the business competition privilege was to serve as a defense. Consequently, they conclude the list was prejudicial because the jury found against the company on the other two forms of conduct listed as examples—fraud and intentional interference with prospective business relations—and so the only remaining example that was supported by evidence was intentional interference with contract.

 We agree with the former employees and the new business that, under these circumstances, the instruction was, in part, circular. It instructed the jury that (1) the company was required to prove that the former employees and the new business intentionally interfered with the company's at-will contracts; (2) the former employees' and the new business's conduct in intentionally interfering with the at-will contracts was protected by the business competition privilege unless the former employees and the new business employed wrongful means; but (3) intentional interference with the at-will contracts was wrongful means, which erased the business competition privilege.

However, we are not persuaded that this instruction was prejudicial error requiring us to reverse the judgment. First, in the instruction, the phrase "for example" preceded the list of types of conduct that could be wrongful means of inducement. The inclusion of this phrase meant that the listed types of conduct were merely illustrations, and that there were other varieties of wrongful means that were not listed. *See Webster's Third New International Dictionary* 791 (2002) (defining "example" to be "a particular single item, fact, incident, or aspect that may be taken fairly as typical or representative of all of a group or type"; and describing the phrase "for example" as an adverb meaning "as an example").

Therefore, the inclusion of the wrongful means for which no evidence was submitted to the jury—physical violence, threats of criminal prosecution, or threats of civil suit—was not misleading. The instruction clearly indicated that those types of wrongful means

served merely examples, and were thus not the only wrongful means at issue.

 Moreover, apart from the examples of wrongful conduct enumerated in the instruction, the jury found that the former employees and the new business had committed other torts that would qualify as wrongful means of inducement.

- The jury found the former employees and the new business liable for conversion. Conversion is an intentional tort, defined "as any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." *Stauffer v. Stegemann,* 165 P.3d 713, 717 (Colo.App.2006); Restatement (Second) of Torts § 222A(1) (1965) ("Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."). However, the tort does not require that a tortfeasor act with the specific intent to permanently deprive the owner of his or her property. *Itin v. Ungar,* 17 P.3d 129, 136 n. 10 (Colo.2000).

- The jury found the former employees liable for the tort of breach of fiduciary duty. *See Resolution Trust Corp. v. Heiserman,* 898 P.2d 1049, 1056 (Colo. 1995); Restatement (Second) of Torts § 874 cmt. b (1979) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act.").

- The jury awarded the company punitive damages for the torts of conversion and breach of fiduciary duty, after being instructed that to award such damages it was required to "find beyond a reasonable doubt that [the new business or the former employees] acted in a fraudulent or malicious manner in causing [the company's] damages." *See* § 13–21–102(1), C.R.S.2008 (jury may award punitive damages "[i]n all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury com-

plained of is attended by circumstances of fraud, malice, or willful and wanton conduct").

Under *Amoco Oil Co.* and *DP–Tek, Inc.,* the torts of conversion and breach of fiduciary duty constitute wrongful means of inducement. They are "independently actionable"; "capable of forming the basis of liability for the actor"; or "wrongful by reason of a ... recognized rule of common law [or] ... deceit or misrepresentation." *Amoco Oil Co.,* 908 P.2d at 502 n. 6; *DP–Tek, Inc.,* 100 F.3d at 833–35. Indeed, a division of this court previously concluded that breach of a fiduciary duty constitutes wrongful means, thus rendering the business competition privilege unavailable. *McCrea & Co. Auctioneers, Inc. v. Dwyer Auto Body,* 799 P.2d 394, 397–98 (Colo.App.1989) (reasoning that "'wrongful means' necessarily include breach of [fiduciary] duty"). Further, here, in its award of punitive damages, the jury found that these torts were committed in a fraudulent and malicious manner.

Therefore, we conclude that the error in the instruction concerning wrongful means was harmless. The error did not prejudice the substantial rights of the former employees and the new business because the jury's findings concerning the torts of conversion and breach of fiduciary duty constituted wrongful means. Because the wrongful means listed in the instruction were clearly meant as illustrations of wrongful means, and not an exhaustive list, the jury was free to consider conversion and breach of fiduciary duty as the wrongful means necessary to find that the former employees and the new business had improperly interfered with the company's contractual relations.

Put another way, even if the jury had been given a correct instruction, which (1) excluded the wrongful means unsupported by evidence—physical violence, threats of criminal prosecution, or threats of civil suit; (2) excluded the tort—intentional interference with contract—to which the business competition privilege applied; and (3) added the torts—conversion and breach of fiduciary duty—that qualified as wrongful means, we conclude that the jury would probably have reached the same verdicts. *See Webb,* 718

P.2d at 1066–67 (reversal is required when, had "the jury had been properly instructed ... the result of [the] claim ... probably would have been different"); *Cissell Mfg. Co. v. Park,* 36 P.3d 85, 89–90 (Colo.App.2001)(erroneous instructions on counterclaims were harmless because of the manner in which jury found against defendant).

### C. Jury Instruction on Punitive Damages

During the instructions conference, the trial court agreed to instruct the jury that "[p]unitive damages, if awarded, are to punish the defendant and to serve as an example to others." This sentence, which described the purpose of punitive damages, was omitted from the version of the instructions the court read to the jury, and which was given to the jury to guide its deliberations. However, the jury was instructed that, in order to award punitive damages, it must "find beyond a reasonable doubt that any defendant acted in a fraudulent or malicious manner in causing the plaintiff's damages."

The former employees and the new business contend that the trial court's failure to inform the jury of the purpose of punitive damages violated their constitutional right to due process because the jury's discretion to award punitive damages was not adequately constrained. We decline to address this argument because this alleged error was not preserved below, and because the alleged error is not sufficiently compelling to justify plain error review in this civil case.

The former employees and the new business concede that they did not object to the punitive damages instruction because the pertinent sentence had been omitted. However, they contend that they had no opportunity to object because the trial court did not notify them of the omission.

We are not persuaded by this argument because the former employees and the new business had opportunities to object to the omission before the jury returned its verdict. They could have objected when the final instruction packet, which contained the faulty instruction, was given to them for their final review; or when the particular instruction

was read to the jury in open court; or after the court completed its reading of all of the instructions and before the written instructions were sent to the jury; or during the jury's deliberations before it returned a verdict.

A similar situation arose in *Kinard v. Coats Co.*, 37 Colo.App. 555, 553 P.2d 835 (1976), when a phrase was omitted from a jury instruction given to the jury. The division concluded:

[I]f the instruction was unclear and unsuitable, it was incumbent upon [the party] to direct the trial court's attention to the faulty instruction in order to obtain a correction of it. This it did not do. A party may not consent to the submission of an instruction, and thereafter complain, upon appeal, that the instruction failed to set forth applicable law.

*Id.* at 558, 553 P.2d at 838.

We therefore conclude that, under C.R.C.P. 51, the former employees and the new business waived this issue by failing to make a timely objection. This issue does not fall within the rare circumstances, involving unusual or special cases, justifying the application of the plain error doctrine in a civil context. *See Robinson*, 30 P.3d at 684.

### III. Damages

The former employees and the new business contend that the amount of actual damages awarded by the jury is excessive and is not supported by the evidence. While we agree that the trial court improperly awarded the company damages for unjust enrichment, we disagree that the damages award was otherwise excessive.

### A. Standard of Review

It is within the sole province of the jury to determine the amount of damages, and, as long as the award is not completely without support in the record, we will not disturb the amount awarded. *Mahan v. Captiol Hill Internal Med. P.C.*, 151 P.3d 685, 689 (Colo.App.2006). The amount of damages must be established by a preponderance of the evidence with reasonable certainty. *Id.* To satisfy this obligation, a plaintiff must provide substantial evidence which will, when combined with reasonable inferences drawn from the evidence, provide a reasonable foundation for the computation of damages. *Id.* A plaintiff is not barred from recovering damages because the amount of loss was not proved with mathematical certainty. *Denny Constr., Inc. v. City & County of Denver*, 199 P.3d 742, 749 (Colo.2009) (although there are "uncertainties inherent in any estimation of future damages," such uncertainties generally do not prevent plaintiffs from proving them); *Clough v. Williams Prod. RMT Co.*, 179 P.3d 32, 42 (Colo.App. 2007).

When evaluating whether an award is excessive, we view the evidence in the light most favorable to the party who was awarded damages, and we draw every reasonable inference from the evidence in favor of that party. *Furnary v. Merritt*, 837 P.2d 192, 196 (Colo.App.1991).

### B. Amount of Damages

The former employees and the new business argue that the actual damages awarded by the jury were excessive because (1) in setting the figure, the jury must have relied on expert testimony concerning the value of the company's accounts that was not allowed into evidence; (2) there was insufficient evidence in the record to support an award of actual damages that was substantially above the figure established by the expert calculations provided by the company; (3) the company did not present distinct evidence to support a damages award for each of the claims or for each of the former employees and the new business separately; (4) the jury only found the former employees and the new business liable for some of the claims the company asserted; and (5) the company is not entitled to damages for the equitable remedy of unjust enrichment because it had an adequate remedy at law. We reject the first four claims, but we agree with the fifth.

#### 1. & 2. Reliance on Excluded Testimony and Sufficiency of the Evidence

The former employees and the new business treat the first two issues separately, but we will address them together because

they are intertwined. Here, an expert called by the company testified that the company's actual damages were $1,165,831. The jury awarded actual damages of $1,929,500. The former employees and the new business argue that the actual damages are excessive, and that the only way that the jury could have arrived at the figure is by relying on disallowed expert testimony. We are not persuaded.

The jury received a separate instruction describing actual damages for each tort. These instructions included a specific reference to lost profits, but also informed the jury it could award "an amount that places [the company] in the position [the company] would have enjoyed had [the former employees and the new business] not breached the [c]onfidentiality [a]greement"; "any loss of [the company's] property or assets caused by the breach of fiduciary duty"; [a]ny other consequential damages of ... [the] conduct [of the former employees and the new business resulting from the intentional interference with contracts] including ... "damages resulting from disruption to [the company's business]"; and "damages resulting from disruption to [the company's] business" resulting from conversion.

■■■ The jury was also instructed: "Difficulty or uncertainty in determining the precise amount of damages does not prevent you from deciding an amount. You should use your best judgment on the evidence." We must presume the jury understood and followed these instructions. *Bear Valley Church of Christ v. DeBose*, 928 P.2d 1315, 1331 (Colo.1996).

■■■ Juries are not required to accept expert testimony, and they may base their award of damages on other evidence in the record. *See Odenbaugh v. County of Weld*, 809 P.2d 1059, 1062 (Colo.App.1990). Here, the record indicates that there was evidence about actual damages from several sources, including an expert called by the former employees and the new business, on which the jury could have relied. This included testimony about lost profits, lost revenues, and the value of the accounts that the former employees and the new business took from the company. There was some evidence in-

dicating that the company's expert was overly conservative in calculating the lost profits at $1,165,831. Although the trial court barred the company's expert from testifying about his theory of valuing the accounts as a measure of the value of the consulting department, the trial court did not bar other evidence about the valuation theory the expert espoused; the court did not inform the jury it could not consider evidence of valuation relating to that theory; and there was competent evidence in the record that the jury could reasonably consider in determining the value of the consulting department and of the new business.

The jury was instructed that it could consider damages other than lost profits. In addition, substantial evidence in the record, when combined with the reasonable inferences to be drawn from that evidence, supports the damages award. Therefore, we will not disturb the award, *Mahan*, 151 P.3d at 689, and we conclude that the record does not support the claim that the jury could only reach the award by relying on disallowed expert testimony.

### 3. Duplicative Damages

The former employees and the new business argue that the trial court's judgment interprets the jury's verdicts as awarding the company duplicative and overlapping damages on the various torts. This contention is based on the verdict forms and the trial court's final judgment. The company seems to agree with this interpretation. We do not.

The verdict forms were sequential. They began with question number 1: "Do you find that [the former employees] breached a confidentiality agreement between [the former employees and the company]?" This question was followed by an answer, which consisted of a list of the names of the former employees and the other employees, followed by two columns labeled "Yes" and "No." Thus, the jurors could answer the question as to each employee by checking a blank in a column.

After the answer, a sentence read that, "IF YOU ANSWERED 'YES' TO QUESTION NO. 1 REGARDING ANY DEFEN-

DANT, PROCEED TO QUESTION NO. 2. IF NOT, PROCEED TO QUESTION NO. 3." Question number 2 stated: "As to each [former employee] for whom you answered 'yes' in response to Question No. 1, what is the amount of damages to [the company] caused by that [former employee's] breach of a confidentiality agreement between that [former employee and the company]?" Question number 2 was followed by an answer that listed the names of the former employees in one column, labeled "Defendant," and a blank next to each name, labeled "Amount of Damages." The verdict forms proceed in the same manner for twenty-two numbered questions, which address all the torts submitted to the jury, actual damages, and punitive damages.

On the verdict forms for all of the claims after the breach of confidentiality agreement form, the jury used the phrase "previously awarded + [plus]" when assessing actual damages. To illustrate, against former employee Michael Robinson, the jury awarded actual damages of $50,000 for breach of a confidentiality agreement; "previously awarded + [$]60,000" for breach of fiduciary duties; "previously awarded + [$]200,000" for intentional interference with a contract; and "previously awarded + [$]5,000" for conversion.

The trial court entered a detailed judgment. To illustrate, when addressing the judgment against former employee Michael Robinson, it stated:

> Judgment is entered against [Michael Robinson] and in favor of [the company] in the total amount of $382,000, as broken down in Appendix A, on [the company's] claims for (1) breach of contract, (2) breach of fiduciary duty, (3) intentional interference with contract, (4) unjust enrichment, and (5) common law conversion.

Appendix A stated:

The judgment against [Michael Robinson] in the total amount of $382,000 is comprised of the following:

a. Breach of contract damages: $50,000 in actual damages.

b. Breach of fiduciary duty damages: $110,000 in actual damages and $15,000 in punitive damages. Of this $110,000 in actual damages, (1) $60,000 is in addition to any previously awarded amount for [breach of contract], and (2) $50,000 is damages for the same injury for which [the company] was awarded damages against Robinson for breach of contract.

c. Intentional interference with contract damages: $310,000 in actual damages and $50,000 in punitive damages. Of this $310,000 in actual damages, (1) $200,000 is in addition to any previously awarded amounts for [breach of contract and breach of fiduciary duty], (2) $60,000 is damages for the same injury for which [the company] was awarded against Robinson for breach of fiduciary duties, and (3) $50,000 is damages for the same injury for which [the company] was awarded damages against Robinson for breach of contract.

d. Unjust enrichment damages: $311,000 in actual damages. Of this $311,000 in actual damages, (1) $1,000 is in addition to any previously awarded amount [for breach of contract; breach of fiduciary duties; and intentional interference with contract], (2) $200,000 is damages for the same injury for which [the company] was awarded damages against Robinson for intentional interference with contract, (3) $60,000 is damages for the same injury for which [the company] was awarded damages against Robinson for breach of fiduciary duties, and (4) $50,000 is damages for the same injury for which [the company] was awarded damages against Robinson for breach of contract.

e. Conversion: $316,000 in actual damages and $1,000 in punitive damages. Of this $316,000 in actual damages, (1) $5,000 is in addition to any previously awarded amount on [breach of contract; breach of fiduciary duty; intentional interference with contract; and unjust enrichment], (2) $1,000 is damages for the same injury for which [the company] was awarded against Robinson for unjust enrichment, (3) $200,000 is damages for the same injury for

which [the company] was awarded damages against Robinson for intentional interference with contract, (4) $60,000 is damages for the same injury for which [the company] was awarded damages against Robinson for breach of fiduciary duties, and (5) $50,000 is damages for the same injury for which [the company] was awarded damages against Robinson for breach of contract.

The figure of $382,000 is reached by adding together the jury verdicts for the actual and punitive damages assessed against Robinson for each tort: $50,000 in actual damages for breach of contract; $60,000 in actual damages and $15,000 in punitive damages for breach of fiduciary duty; $200,000 in actual damages and $50,000 in punitive damages for intentional interference with contract; $1,000 in actual damages for unjust enrichment; and $5,000 in actual damages and $1,000 in punitive damages for conversion.

This analysis is consistent with the argument that the company's counsel presented to the jury when discussing how to fill out the form:

> We think $3,050,000 should be allocated on every single claim. If you've already awarded that damage, loss of these profits, on a previous claim to that person, you are to write, "Previously awarded." ... Previously awarded so that we don't double the damages. We're not trying to recover the $3 million over and over and over again.... Now, if you've previously awarded some, but not all, you can write in, "Previously awarded plus," and then you can add an amount for that claim.... [T]he form is designed so that you don't get the same injury twice.

In light of that argument, the jury's verdicts did not increase damages for each claim based upon what was previously awarded. The trial court's order follows that reasoning. It is true that the succession of paragraphs indicates that the actual damages for each claim are based on adding the actual damages awarded for the preceding claim. However, each succeeding paragraph refers to the actual damages for the preceding claims as being for the "same injury" that

was awarded for those claims. In this way, the reference makes clear that the increasing figure is meant to be a running tally of the previous damages awards, and not an additional assessment of damages, or an impermissible factual finding. For example, to read the trial court's judgment in the manner the parties suggest would mean that the judgment against Michael Robinson should have been $1,163,000, rather than the $382,000 that was expressly fixed by the trial court.

The trial court made clear its intent in entering judgment when it prefaced each section for each defendant by writing that "[t]he judgment against [a particular defendant] *in the total amount of* [a precise dollar figure] is comprised of the following." (Emphasis added.) The court's judgment therefore was consistent with the jury's verdict, and did not constitute an improper change in the verdict's substance. *See Sch. Dist. No. 12 v. Sec. Life of Denver Ins. Co.*, 185 P.3d 781, 787 (Colo.2008)(holding that a trial court may amend a jury verdict in form, but not in substance, because "a change of substance [in a jury's verdict] is a change that affects the underlying determination made by the jury").

Thus, based upon our review of the record, we conclude that the trial court did not embellish or misinterpret the jury's verdicts, and that the trial court entered *total* judgments of $1,521,000 against the new business; $382,000 against former employee Michael Robinson; $311,000 against former employee Robert Courtney; $287,000 against former employee Jon Neff; $14,600 against other employee Catherine Grover; $15,250 against other employee Richard Jones; $14,600 against other employee Dennis Lesssard; and $14,600 against other employee Jay Winkelhake.

### 4. Consequence of a Finding of "No Liability" for Some Claims

The former employees and the new business assert that the jury's damages award was excessive because the jury found they were not liable on some of the company's claims. We are not persuaded.

We have concluded above that we will not disturb the damages award because there is competent evidence to support it. The jury found the former employees and the new business liable for several torts. Moreover, as indicated above, the company argued to the jury to award the same amount of damages—$3,050,000—for each tort. The jury awarded less on each.

### 5. Unjust Enrichment

The former employees and the new business argue that, because unjust enrichment is an equitable theory of relief, and the company had an adequate remedy at law, the company was not entitled to an award of damages for unjust enrichment. We agree.

#### a. General Principles

Unjust enrichment is a form of contract, or quasi-contract, implied by law that does not rely upon a promise between parties. The elements of unjust enrichment are: (1) at the expense of a plaintiff; (2) a defendant received a benefit; (3) under circumstances making it unjust for the defendant to retain the benefit without paying for it. *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo.2008). The scope of this equitable remedy is broad, "cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another." *Id.* It is a form of restitution designed to restore the plaintiff to his or her prior status. Restatement (First) of Restitution § 1 (1937).

Trial courts must engage in fact-based inquiries, and then make extensive factual findings, to determine whether a party is entitled to recover under an unjust enrichment claim. Because the power to devise remedies lies within a trial court's discretion, we review a trial court's findings of fact, and the determination that a party was unjustly enriched, for abuse of discretion. *Lewis v. Lewis*, 189 P.3d 1134, 1140–41 (Colo.2008). However, we review de novo whether the trial court applied the proper test to determine whether a defendant was unjustly enriched. *Id.* at 1141.

If the elements of unjust enrichment are proved, the defendant who received the benefit is normally required to make restitution to the plaintiff in the amount of the enrichment the defendant received. If the recovery can reasonably be determined by different measurements, the choice of which measurement to use is within the trial court's discretion. *Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*, 200 P.3d 1133, 1136 (Colo.App. 2008).

#### b. Adequate Legal Remedy

Equity may not be used to fashion relief when there is a "plain, speedy, [and] adequate remedy at law." *Szaloczi v. John R. Behrmann Revocable Trust*, 90 P.3d 835, 842 (Colo.2004). In a contractual context, "a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract." *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo.App. 2003).

In the tort context, the recovery of damages does not automatically lead to a conclusion that a party had an adequate legal remedy that precludes further equitable relief because

> [t]he objectives of the two remedies are different.... [I]n the damage action the plaintiff seeks to recover for the harm done to him, whereas in the restitution action he seeks to recover the gain acquired by the defendant through the wrongful act.

1 George E. Palmer, *Law of Restitution* § 2. 1, at 51 (1978); *see also* W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 94, at 672–73 (5th ed.1984).

Unjust enrichment may be appropriate when "[t]he defendant's wrongful act may be a common-law tort, such as conversion of personal property or trespass to land, or it may be an equitable wrong such as breach of trust or other fiduciary obligation." 1 Palmer, § 2. 1, at 50; *see DCB Constr. Co. v. Central City Dev. Co.*, 965 P.2d 115, 122 (Colo.1998)(for a landlord's retention of a

benefit to be unjust, there must be "some type of improper, deceitful, or misleading conduct by the landlord").

Here, the jury was instructed consistently with this authority: "Unjust enrichment requires some form of misconduct by [the former employees and the new business], such as fraud, coercion, or a clear act of bad faith." The jury subsequently found that the former employees had breached their confidentiality agreements, and that the former employees and the new business had committed torts that fit within this classification, such as conversion and breach of fiduciary duty. We must, therefore, determine whether the damages awarded for the breaches of the confidentiality agreements and the torts also served as restitution to the company to recover "the gain acquired by the defendant through the wrongful act." *See* 1 Palmer, § 2. 1, at 51; *see also Montoya v. Grease Monkey Holding Corp.*, 883 P.2d 486, 489 (Colo.App.1994) ("restitution as a measure of damages was erroneous because [defendant] did not benefit whatsoever from the fraudulent acts"); *Schuette v. Winternitz*, 498 P.2d 1183, 1185 (Colo.App.1972)(not published pursuant to C.A.R. 35(f))(where the defendant committed fraud to encourage the plaintiff to invest in the defendant's business, but the defendant never received any consideration from the plaintiff, the plaintiff's only remedy was an action for damages).

### c. Instructions

As relevant here, Instruction 2 set forth a summary of the company's claims. In describing the unjust enrichment claim, the instruction stated that it was the company's position that the former employees and the new business "received a benefit, at [the company's] expense, consisting of [the company's] entire Financial Consulting Unit, including its confidential information, its files, and its business resources."

The instructions describing each tort were followed by instructions indicating possible sources of damages:

- Breach of the confidentiality agreement: actual damages, consisting of "an amount that places [the company] in a position [the company] would have enjoyed had [the former employees] not breached the [c]onfidentiality [a]greement"; "any loss of net profits" resulting from the breach; and "[a]ny other consequential damages, including costs resulting from damage to [the company's] computer system and damages resulting from disruption to [the company's] business."

- Breach of fiduciary duty: past or future economic losses, including "[a]nything of value or profit" the former employees and the new business received as a result of the breach; "[a]ny loss of [the company's] property or assets caused by the breach"; "[a]ny loss of profits which [the company] could reasonably have expected to earn" absent the breach; and "[a]ny other consequential damages of [the conduct of the former employees and the new business], including costs resulting from damage to [the company's] computer system and damages resulting from disruption to [the company's] business."

- Intentional interference with contract: past or future economic losses, including "[a]ny lost profits which [the company] could reasonably have expected to earn had there been no interference by [the former employees and the new business]"; and "[a] ny other consequential damages of [the conduct of the former employees and the new business], including costs resulting from damage to [the company's] computer system and damages resulting from disruption to [the company's] business."

- Conversion of personal property: actual damages, including "the fair market value of the converted property at the time and place of the conversion, and any consequential damages resulting from the conversion, including loss of profits, damage to [the company's] computer system and damages resulting from disruption to [the company's] business."

### d. Analysis

These instructions indicate that the benefits the company claimed the former employees and the new business unjustly received—the company's consulting unit, its

confidential information, its files, and its business resources—were contained within the damages awarded for breach of the confidentiality agreement and for the torts. For example, the value of the benefits was covered by (1) the actual damages generated by breach of the confidentiality agreement ("an amount that places [the company] in a position [it] would have enjoyed had [the former employees] not breached the [c]onfidentiality [a]greement"); (2) the economic damages arising from breach of fiduciary duty ("[a]nything of value or profit" the former employees and the new business received as a result of the breach and "[a]ny loss of [the company's] property or assets caused by the breach"); (3) the actual damages arising from conversion of personal property ("the fair market value of the converted property at the time and place of the conversion"); (4) the lost profits generated by the torts of breach of the confidentiality agreement, breach of fiduciary duty, and intentional interference with contract; and (5) the consequential damages associated with all of the claims ("[a]ny other consequential damages of [the conduct of the former employees and the new business], including costs resulting from damage to [the company's] computer system and damages resulting from disruption to [the company's] business").

We conclude that, because the value of the benefits was included within the damages awarded for breach of the confidentiality agreement, breach of fiduciary duty, intentional interference with contract, and conversion, the damages also functioned as restitution to the company to recover the gain the former employees and the new business obtained through their wrongful acts. We further conclude that the company had an adequate remedy at law, and that all of the jury awards for unjust enrichment must therefore be reversed.

## IV. Prejudgment Interest

The former employees and the new business contend that the trial court improperly calculated the award of prejudgment interest to the company. We agree.

■ The award of prejudgment interest in this case is governed by section·5–12–102,

C.R.S.2008. *See, e.g., Westfield Dev. Co. v. Rifle Inv. Assocs.,* 786 P.2d 1112, 1122 (Colo.1990)(prejudgment interest is proper for pecuniary damages caused by intentional interference with contract). Prejudgment interest is due from the date a defendant breaches a contract, *Goodyear Tire & Rubber Co. v. Holmes,* 193 P.3d 821, 826 (Colo. 2008); breaches his or her fiduciary duty, *Vento v. Colorado National Bank–Pueblo,* 907 P.2d 642, 647–48 (Colo.App.1995); and refuses to return the property that is the subject of a conversion claim to its rightful owner, *National Surety Corp. v. Citizens State Bank,* 734 P.2d 663, 665 (Colo.App. 1986).

■ However,

[t]he plain language of [section 5–12–102] indicates ... that prejudgment interest is allowed only on past losses. Section 5–12–102 specifically awards interest on money which is due and owing prior to the date of payment or prior to the date judgment is entered.

Thus, under § 5–12–102, interest may not be awarded on lost *future* wages and benefits because they are not due and owing prior to the entry of judgment. Simply put, since future wages are not due, there is no delay in the receipt of the money, and therefore, a plaintiff does not experience a loss on such earnings.

Accordingly, under § 5–12–102, plaintiff is entitled to prejudgment interest only on the loss of income accrued as of the date of trial.

*Shannon v. Colo. Sch. of Mines,* 847 P.2d 210, 213 (Colo.App.1992)(emphasis in original). This reasoning has been extended to lost future profits. *Bennett v. Greeley Gas Co.,* 969 P.2d 754, 765–66 (Colo.App.1998).

■ Here, the trial court awarded prejudgment interest on both past and future damages. We conclude that this part of the judgment must be reversed. On remand, the trial court must award prejudgment interest only on the damages that were incurred before judgment was entered. *See Life Care Ctrs. of Am., Inc. v. E. Hampden Assocs. Ltd. P'ship,* 903 P.2d 1180, 1189 (Colo.App. 1995).

█ We recognize that the trial court's task may be difficult because the jury's damages award did not expressly distinguish between damages incurred before judgment and lost future profits. Thus, it is incumbent on the parties to provide the court with assistance in resolving this issue, and it is incumbent on the court to keep in mind that difficulty in computation, as opposed to impossibility of determination, does not weigh against an award of prejudgment interest. *S. Park Aggregates, Inc. v. NW. Nat'l Ins. Co.*, 847 P.2d 218, 226 (Colo.App.1992) (absent an independent agreement, entitlement to prejudgment interest is a statutory right); *see Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed.Cir.1996)(trial court erred by denying prejudgment interest simply because it was difficult to calculate); *Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 836 (2d Cir.1992)(stating that "while the presence of 'abstruse inquiries' and 'difficult questions of proof' in the calculation of damages are factors to be considered carefully, these problems must be considered together with other factors that may favor prejudgment interest"); 1 Dan B. Dobbs, *Dobbs Law of Remedies: Damages, Equity, Restitution* § 3.6(1), at 336 (2d ed. 1993) ("Prejudgment interest is allowable where the amount of damages is definitely ascertainable by mathematical computation, or if the evidence furnishes data that makes it possible to compute the amount without reliance on opinion or discretion.").

The part of the judgment awarding damages for unjust enrichment is reversed, and the case is remanded to the trial court to enter judgment on damages for the company excluding the damages for unjust enrichment. The part of the judgment awarding prejudgment interest is also reversed, and the case is remanded to the trial court to recompute prejudgment interest, and to enter judgment on the new amount. The remainder of the judgment is affirmed.

Judge DAILEY and Judge J. JONES concur.