Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 20, 2024

2024 CO 30

**No. 23SA186, *Miller v. Crested Butte, LLC*—Absolution of Statutory Duty by Private Agreement.**

In this case, the supreme court considers whether a defendant may absolve itself of statutory duties imposed by the Ski Safety Act of 1979, sections 33-44-101 to -114, C.R.S. (2023), the Passenger Tramway Safety Act, sections 12-150-101 to -120, C.R.S. (2023), and regulations promulgated thereunder by way of private agreements purporting to release negligence claims against it. The court further considers whether the district court properly applied the factors set forth in *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981), to uphold the private release agreements signed by the plaintiff in this case and to dismiss two negligence-based claims brought by the plaintiff.

The court now concludes that the defendant here may not absolve itself, by way of private release agreements, of liability for violations of the statutory and regulatory duties on which the plaintiff's negligence per se claim is based.

Accordingly, the court concludes that the district court erred in dismissing that claim.

The court next concludes that the district court properly applied the *Jones* factors to determine that the release agreements that the plaintiff signed are enforceable and thus bar plaintiff's purported claim for "negligence-highest duty of care."

Accordingly, the court makes its rule to show cause absolute in part and discharges it in part, and remands this case to the district court with instructions to reinstate plaintiff's negligence per se claim and for further proceedings consistent with this opinion.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2024 CO 30**

**Supreme Court Case No. 23SA186**
*Original Proceeding Pursuant to C.A.R. 21*
Broomfield County District Court Case No. 22CV30333
Honorable Sean Finn, Judge

**In Re**
**Plaintiff:**

Michael D. Miller, as parent and guardian of Annalea Jane Miller,

v.

**Defendant:**

Crested Butte, LLC d/b/a Crested Butte Mountain Resort.

**Rule Made Absolute in Part and Discharged in Part**
*en banc*
May 20, 2024

**Attorneys for Plaintiff:**
Leventhal Puga Braley P.C.
Jim Leventhal
Bruce L. Braley
Brian N. Aleinikoff
 *Denver, Colorado*

**Attorneys for Defendant:**
Bryan Cave Leighton Paisner LLP
Michael J. Hofmann
Kaitlin M. DeWulf
 *Denver, Colorado*

Wheeler Trigg O'Donnell LLP
Craig R. May
Frederick C. Yarger
*Denver, Colorado*

**Attorneys for Amicus Curiae Colorado River Outfitters Association:**
Hall & Evans, LLC
Peter C. Middleton
*Denver, Colorado*

**Attorneys for Amici Curiae Colorado Ski Country USA, Inc.; Colorado Camps Network; and Challenge Aspen:**
Childs McCune LLC
Jordan L. Lipp
*Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Trial Lawyers Association:**
Ramos Law
S. Paige Singleton
*Northglenn, Colorado*

**Attorneys for Amicus Curiae National Ski Areas Association:**
Zweig Law PC
Brian A. Birenbach
*Breckenridge, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT**, **JUSTICE HOOD**, **JUSTICE SAMOUR**, and **JUSTICE BERKENKOTTER** joined.
**JUSTICE MÁRQUEZ**, joined by **JUSTICE HART**, concurred in part and dissented in part.

2

JUSTICE GABRIEL delivered the Opinion of the Court.

¶1     This C.A.R. 21 proceeding, which arises out of a chair lift accident that left minor Annalea "Annie" Jane Miller a quadriplegic, requires us to address two issues.  First, we must determine whether defendant Crested Butte, LLC d/b/a Crested Butte Mountain Resort may absolve itself of statutory duties imposed by the Ski Safety Act of 1979 (the "SSA"), sections 33-44-101 to -114, C.R.S. (2023), the Passenger Tramway Safety Act (the "PTSA"), sections 12-150-101 to -120, C.R.S. (2023), and regulations promulgated thereunder by way of private agreements purporting to release negligence claims against it.  Second, we must determine whether the district court properly applied the factors set forth in *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981), to uphold the private release agreements and dismiss two negligence-based claims brought by Michael D. Miller, as parent and guardian of Annalea Jane Miller (for clarity, we will refer to Michael D. Miller as "Miller" and to Annalea Jane Miller as "Annie"; in using Annie's first name, we intend no disrespect).

¶2     We conclude that the first issue relates only to Miller's second claim for relief, which is denominated a claim for negligence per se.  After determining that that claim states a viable negligence per se claim, we further conclude, as a matter of first impression, that Crested Butte may not absolve itself, by way of private release agreements, of liability for violations of the statutory and regulatory duties

on which Miller's negligence per se claim is based. Accordingly, we conclude that the district court erred in dismissing that claim (we, however, express no opinion on the ultimate merits of the claim).

¶3 We next determine that, in light of our foregoing conclusion, the second issue before us relates only to Miller's first claim for relief, which purports to state a claim for negligence-highest duty of care. As to this claim, we conclude that the district court properly applied the *Jones* factors to determine that the release agreements that Miller signed are enforceable and thus bar that claim.

¶4 Accordingly, we make our rule to show cause absolute in part and discharge it in part, and we remand this case to the district court with instructions to reinstate Miller's negligence per se claim and for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶5 Because this matter comes before us in the context of an order granting, in part, a motion to dismiss, we accept, without expressing an opinion on, the facts as alleged in Miller's complaint, as well as the facts presented in the documents submitted by the parties in connection with their briefing in the district court.

¶6 Crested Butte sells ski passes through www.EpicPass.com. When customers access the website to buy a ski pass, they are required to agree to a release of liability. After customers check the box for "Release of Liability," the

4

website displays the release language in full, and the customers must select the "I Agree" button, affirming that they "have read and agree to the terms of the Release of Liability."

¶7 In November 2021, Miller purchased through the website three-day Epic ski passes for himself and Annie. In doing so, he signed a Release of Liability, Waiver of Claims, Assumption of Risks and Indemnity Agreement on Annie's behalf. This Agreement stated, in pertinent part:

> 1. Each person participating in the Activity (defined below) or purchasing a Season Pass is referred to as Participant. I, the undersigned, am a Participant and, if a Participant is under 18 years old (US) or 19 years old (Canada), I am the minor/child/infant Participants [sic] parent or legal guardian. I understand that participating in . . . skiing, . . . and using the lifts, . . . and the premises in general, for any purpose (the Activity), can be HAZARDOUS AND INVOLVE THE RISK OF PHYSICAL INJURY AND/OR DEATH.
>
> . . . .
>
> 5. I expressly acknowledge and assume all additional risks and dangers that may result in property damage, physical injury and/or death, which may be above and beyond the inherent dangers and risks of the Activity, including but not limited to: . . . the negligence or failure of Participant, Ski Area employees, or other guests to act safely . . . ; misloading, entanglements, or falls from ski lifts . . . .
>
> . . . .
>
> 7. In consideration for allowing the Participant to participate in the Activity, I AGREE, to the greatest extent permitted by law, TO WAIVE ANY AND ALL CLAIMS AGAINST AND TO HOLD HARMLESS, RELEASE, INDEMNIFY, AND AGREE NOT TO SUE Vail Resorts, Inc., . . . each of [its] affiliated companies and

subsidiaries, the resort owner/operator inclusive of any partner resort owner/operator, . . . and all their . . . successors in interest . . . FOR ANY INJURY, INCLUDING DEATH, LOSS, PROPERTY DAMAGE OR EXPENSE, WHICH I OR PARTICIPANT MAY SUFFER, ARISING IN WHOLE OR IN PART OUT OF PARTICIPANTS [sic] PARTICIPATION IN THE ACTIVITY, INCLUDING, BUT NOT LIMITED TO, THOSE CLAIMS BASED ON ANY RELEASED PARTYS [sic] ALLEGED OR ACTUAL NEGLIGENCE OR BREACH OF ANY EXPRESS OR IMPLIED WARRANTY OR BREACH OF ANY STATUTORY OR OTHER DUTY OF CARE . . . . I UNDERSTAND THAT NEGLIGENCE INCLUDES FAILURE ON THE PART OF ANY RELEASED PARTY TO TAKE REASONABLE STEPS TO SAFEGUARD OR PROTECT ME FROM THE RISKS, DANGERS AND HAZARDS OF THE ACTIVITY.

. . . .

12. BY SIGNING ON BEHALF OF A MINOR/CHILD/INFANT OR OTHER PARTICIPANT, I REPRESENT THAT I AM AUTHORIZED TO SIGN ON PARTICIPANTS [sic] BEHALF and/or I AM THE PARENT OR LEGAL GUARDIAN OF THE MINOR/CHILD/ INFANT PARTICIPANT and acknowledge that Participant is bound by all the terms of this Agreement. I understand that the minor Participant would not be permitted to take part in any of the Activities unless I agree to the terms of this Agreement.

¶8 The Epic Pass, which all customers were required to have scanned before boarding a chair lift, also contained a Release of Liability & Assumption of Risks Agreement. This Agreement provided, in pertinent part:

HOLDER AGREES AND UNDERSTANDS THAT SKIING, SNOWBOARDING AND USING A SKI AREA, INCLUDING LIFTS, CAN BE HAZARDOUS AND INVOLVE THE RISK OF PHYSICAL INJURY AND/OR DEATH.

WARNING: Under the law, the Holder of this pass assumes the risk of any injury to person or property resulting from any of the inherent

6

> dangers and risks of skiing and may not recover from the ski area operator and its employees for any injury resulting from any of the inherent dangers and risks of skiing. . . . Other risks include . . . misloading, entanglements, or falls from ski lifts and the negligence of ski area employees. . . . HOLDER AGREES TO ASSUME ALL RISKS, inherent or otherwise. HOLDER AGREES NOT TO SUE and to hold the ski area and its employees harmless for claims to person or property.

(For convenience, we refer to Miller's having signed the foregoing release agreements even though he may not have physically signed them but rather assented to their application by purchasing and using the passes.)

¶9 On March 16, 2022, Miller and Annie skied at Crested Butte. At one point during the day, Annie attempted to get seated on a chair lift but was unable to do so. To try to keep from falling, she grabbed the chair, and Miller, who had gotten seated, grabbed her. Miller, along with another person who was seated on the chair lift and people in the lift line, began yelling for someone to slow or stop the lift, but the lift continued without slowing or stopping. Miller alleges that there was no lift attendant or operator present at the load line who could slow or stop the lift. As a result, the lift continued to ascend with Annie hanging from the chair and Miller continuing to scream for someone to stop the lift. As the chair continued to move up the mountain, Miller attempted to lift Annie onto the seat, but he could not do so. Annie tried to keep hold of the chair, and Miller tried to keep hold of her, but when neither could hold on any longer, Annie fell approximately thirty feet to the ground and landed directly on her back.

According to Miller, at no time before Annie fell did a lift attendant or operator take any action to slow or stop the lift.

¶10 Annie's fall caused substantial injuries, including severe spinal compression fractures, one of which damaged her spinal cord; thoracic disc injuries; pulmonary contusions; and a liver laceration. Annie's injuries have left her a quadriplegic.

¶11 Miller subsequently sued Crested Butte in the Broomfield County District Court, alleging three causes of action: (1) negligence-highest duty of care of ski lift operator; (2) negligence per se based on violations of the SSA, the PTSA, and a number of specifically identified regulations promulgated thereunder; and (3) gross negligence.

¶12 Crested Butte moved to dismiss the Complaint on a number of grounds, including, as pertinent here, that the negligence per se claim failed to state a claim on which relief could be granted and that the negligence-highest duty of care and purported negligence per se claims were barred by the releases of liability that Miller had signed. Miller responded that he had properly pleaded a negligence per se claim and that the releases that he signed were unenforceable.

¶13 The district court ultimately granted Crested Butte's motion as to Miller's negligence-highest duty of care and negligence per se claims but denied the motion as to Miller's gross negligence claim. *Miller ex rel. Miller v. Vail Resorts, Inc.*,

No. 22CV30333 (Dist. Ct., Broomfield Cnty., Apr. 3, 2023). (The gross negligence claim is not at issue before us, and thus, we do not address it further.)

¶14 In so ruling, the court first considered the negligence per se claim and concluded that under the court of appeals division's decision in *Redden v. Clear Creek Skiing Corporation*, 2020 COA 176, 490 P.3d 1063, Miller had not stated a viable negligence per se claim because the statutory duties on which Miller based his claim imposed no more than a reasonable duty of care and this was insufficient to state a negligence per se claim on which relief could be granted.

¶15 The court next proceeded to consider Miller's negligence-highest duty of care claim and, applying the *Jones* factors, determined that the releases that Miller signed were enforceable and that those releases barred the claim. (The court also noted in a footnote that to the extent the purported negligence per se claim was, in essence, a simple negligence claim, it would be barred on the same grounds.)

¶16 Miller then sought C.A.R. 21 relief in this court, and we issued a rule to show cause.

## II. Analysis

¶17 We begin by discussing our jurisdiction under C.A.R. 21 and the applicable standard of review and principles of statutory construction. Next, we consider whether Crested Butte could absolve itself of liability for negligence per se by way of private release agreements. Last, we consider whether the district court

9

properly applied the *Jones* factors to conclude that the releases that Miller had signed were enforceable and barred his negligence-highest duty of care claim.

## A. Original Jurisdiction

¶18 The exercise of our original jurisdiction under C.A.R. 21 lies within our sole discretion. *People v. Tafoya*, 2019 CO 13, ¶ 13, 434 P.3d 1193, 1195. An original proceeding under C.A.R. 21 is an extraordinary remedy that is limited in its purpose and availability. *Id.* We have exercised our jurisdiction under C.A.R. 21 to address a district court's abuse of discretion or ruling in excess of its jurisdiction when no other adequate appellate remedy exists. *People v. Jones*, 2015 CO 20, ¶ 6, 346 P.3d 44, 46. We have also exercised our discretion under C.A.R. 21 to hear matters that present issues of significant public importance that we have not previously considered. *Tafoya*, ¶ 13, 434 P.3d at 1195.

¶19 Here, the district court's order dismissing the two causes of action at issue raises a substantial question as to whether ski resorts may avoid liability for negligence per se, based on violations of the SSA, the PTSA, or the regulations promulgated thereunder, by requiring patrons to sign exculpatory agreements releasing such claims. We have not previously addressed this question, and, in our view, it presents a matter of significant public importance, given the broad use of liability releases in the ski industry in Colorado.

10

¶20 Accordingly, we deem it appropriate to exercise our discretion under C.A.R. 21 to hear this matter.

## B. Standard of Review and Principles of Statutory Construction

¶21 We review de novo a district court's order granting a C.R.C.P. 12(b)(5) motion to dismiss. *People ex rel. Rein v. Meagher*, 2020 CO 56, ¶ 13, 465 P.3d 554, 558. In conducting this review, we apply the same standards as the district court, and we accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Bly v. Story*, 241 P.3d 529, 533 (Colo. 2010).

¶22 In addition, we have adopted a "plausibility" standard for determining such motions. *Meagher*, ¶ 13, 465 P.3d at 558. In order to survive a motion to dismiss under this standard, a plaintiff must allege a plausible claim for relief. *Id.*

¶23 This case also involves matters of statutory construction. We review questions of statutory construction de novo. *Bd. of Cnty. Comm'rs v. Colo. Dep't of Pub. Health & Env't*, 2021 CO 43, ¶ 17, 488 P.3d 1065, 1069. When interpreting statutes, we seek to discern and effectuate the General Assembly's intent. *Id.* In doing so, we apply words and phrases in accordance with their plain and ordinary meanings, and we look to the entire statutory scheme to give consistent, harmonious, and sensible effect to all of its parts. *Id.* In addition, we avoid constructions that would render any words or phrases superfluous or that would

lead to illogical or absurd results.  *Id.*  And in construing a statute, we must respect the General Assembly's choice of language.  *UMB Bank, N.A. v. Landmark Towers Ass'n*, 2017 CO 107, ¶ 22, 408 P.3d 836, 840.  Accordingly, we will not add words to a statute or subtract words from it.  *Id.*

¶24    If the statutory language is unambiguous, then we must apply it as written, and we need not resort to other rules of statutory construction.  *Bd. of Cnty. Comm'rs*, ¶ 17, 488 P.3d at 1069.  "A statute is ambiguous when it is reasonably susceptible of multiple interpretations."  *Elder v. Williams*, 2020 CO 88, ¶ 18, 477 P.3d 694, 698.

## C.  Negligence Per Se Claim

¶25    Miller asserts that the district court erred in concluding that Crested Butte could absolve itself, through private release agreements, of liability for per se negligence based on violations of Crested Butte's statutory and regulatory duties. Although Miller contends that this issue applies to both his first and second claims for relief, Miller's first claim does not appear to be premised on statutory or regulatory duties.   Rather, it appears to assert a common law claim for negligence-highest duty of care.  As a result, we construe Miller's first contention before us as applying only to his negligence per se claim (to the extent that Miller's first claim for relief was intended to be premised on statutory or regulatory duties, it would arguably have been duplicative of the negligence per se claim).

12

¶26 Accordingly, we must decide whether the releases that Miller signed could properly bar his negligence per se claim. This, however, requires us first to consider whether Miller has stated a plausible negligence per se claim.

¶27 Negligence per se occurs when a defendant violates a statute adopted for the public's safety and the violation proximately causes a plaintiff's injury. *Scott v. Matlack, Inc.*, 39 P.3d 1160, 1166 (Colo. 2002). To prevail on a negligence per se claim, a plaintiff "must also demonstrate that the statute was intended to protect against the type of injury she suffered and that she is a member of the group of persons the statute was intended to protect." *Id.* "If the statute applies to the defendant's actions, then the statute conclusively establishes the defendant's standard of care and violation of the statute is a breach of [its] duty." *Id.*

¶28 As pertinent here, section 33-44-104(1)–(2), C.R.S. (2023), provides that a violation of any requirement of article 44 (i.e., the SSA) or of any rule promulgated by the Passenger Tramway Safety Board that causes injury to any person constitutes "negligence." As we have previously observed, however, the effect of these (and other) provisions of the SSA and the PTSA is to render violations of those provisions negligence per se. *Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 74 (Colo. 1998).

¶29 Section 33-44-103(3.5), C.R.S. (2023), in turn, states that nothing in that section shall limit the liability of a ski area operator for injury caused by the use or

13

operation of ski lifts. And section 33-44-114, C.R.S. (2023), provides that if any provision of law or statute is inconsistent with article 44, then article 44 controls.

¶30 In addition, the General Assembly has authorized the Passenger Tramway Safety Board to use as general guidelines, in promulgating rules pursuant to the PTSA, certain standards adopted by the American National Standards Institute ("ANSI"). *See* § 12-150-105(1)(a), C.R.S. (2023). These standards include Rule 3.3.2.3.3, which requires lift attendants, among other things:

> to monitor the passengers' use of the aerial lift; including observing, advising and assisting them while they are in the attendant's work area as they embark on or disembark from the aerial lift; and to respond to unusual occurrences or conditions, as noted. The attendant should respond by choosing an appropriate action, which may include any of the following:
>
> 1) assisting the passenger;
>
> 2) slowing the aerial lift (if applicable);
>
> 3) stopping the aerial lift;
>
> 4) continuing operation and observation.

Nat'l Ski Areas Ass'n, American National Standard for Passenger Ropeways—Aerial Tramways, Aerial Lifts, Surface Lifts, Tows and Conveyors—Safety Requirements § 3.3.2.3.3(b) (Am. Nat'l Standards Inst., Inc. 2017) (known as "ANSI B77.1-2017"); *see also* Dep't of Regul. Agencies, 3 Colo. Code Regs. 718-1, Rule 0.1 (adopting and incorporating by reference the safety requirements in ANSI B77.1-2017) (current version incorporates up to B77.1-2022).

14

¶31   The SSA and PTSA, when read together with our case law, "provide a comprehensive Colorado framework which preserves ski lift common law negligence actions, while at the same time limiting skier suits for inherent dangers on the slopes and defining *per se* negligence for violation of statutory and regulatory requirements." *Bayer*, 960 P.2d at 75.

¶32   In accordance with this long-settled understanding of our statutory framework, we conclude that the above-quoted statutory and regulatory provisions establish that a violation of Rule 3.3.2.3.3 that causes injury constitutes negligence per se.   Specifically, the foregoing provisions were indisputably adopted for the public's safety, and Miller has alleged that the violation of these provisions proximately caused Annie's injury.  In addition, Miller has alleged that the purpose of the foregoing provisions was to protect against the types of injuries, damages, and losses that Annie suffered.  Accordingly, we conclude that Miller has stated a plausible negligence per se claim. *See Scott*, 39 P.3d at 1166.

¶33   In so concluding, we are unpersuaded by the district court's determination that the duties set forth in Rule 3.3.2.3.3 reflect no more than a general duty to exercise reasonable care.  To the contrary, as set forth above, the rule specifies actions that lift attendants must take to avoid injuries to those, like Annie, who entrust their care and safety to the lift attendants.  Thus, the rule requires lift attendants to monitor passengers' use of the lift, including observing, advising,

15

and assisting passengers as they embark on or disembark from the lift; and to respond to unusual occurrences or conditions that may arise. ANSI B77.1-2017, § 3.3.2.3.3(b). The rule further requires lift attendants to respond to unusual occurrences or conditions by choosing an appropriate action, and it provides as examples of such actions assisting the passenger, slowing or stopping the lift, or continuing to operate the lift while observing what is happening. *Id.* In our view, these specifically delineated duties exceed a duty merely to exercise reasonable care.

¶34 We are likewise unpersuaded by Crested Butte's assertion that Rule 3.3.2.3.3 does not unequivocally require a lift attendant to do or refrain from doing anything, but rather gives such attendants broad discretion to decide how to proceed, if at all. In our view, such an interpretation renders Rule 3.3.2.3.3 virtually meaningless. To avoid such a result, as we must, *see Bd. of Cnty. Comm'rs*, ¶ 17, 488 P.3d at 1069, we construe Rule 3.3.2.3.3 as delineating the types of actions expected of lift attendants, without attempting to provide a comprehensive list of all of the actions that may be required in a given circumstance.

¶35 Having thus determined that Miller has stated a plausible negligence per se claim, we still must decide whether Crested Butte could properly absolve itself of liability for such negligence per se through private release agreements. For several reasons, we conclude that it could not do so.

¶36 First, settled precedent from this court has established that a party cannot discharge its obligation to perform a statutory duty by way of an exculpatory agreement. *See, e.g.*, *Peterman v. State Farm Mut. Auto. Ins. Co.*, 961 P.2d 487, 492 (Colo. 1998) ("Parties may not privately contract to abrogate statutory requirements or contravene the public policy of this state."); *Gonzales v. Indus. Comm'n*, 740 P.2d 999, 1002 (Colo. 1987) ("Private parties may not by agreement or rule render ineffectual the rules and standards provided by statute.").

¶37 Because we have concluded, contrary to Crested Butte's assertions and the conclusion of the district court below, that Crested Butte, in fact, owed statutory and regulatory duties to Miller and to Annie, we further conclude that Crested Butte could not avoid those duties by way of private release agreements.

¶38 Second, as noted above, section 33-44-114 provides that if any provision of law is inconsistent with article 44 (i.e., the SSA), then article 44 controls. Accordingly, to the extent that section 13-22-107(3), C.R.S. (2023), which generally allows a parent to release or waive prospective negligence claims of a child, and *Jones*, 623 P.2d at 376, which allows exculpatory agreements in certain circumstances, are inconsistent with article 44, then article 44 controls.

¶39 In this regard, we are not persuaded by Crested Butte's assertion that section 13-22-107(3) controls because (1) it was enacted after the above-quoted provisions of article 44; and (2) subject to exceptions not applicable to the negligence per se

17

claim, its plain language authorizes a parent to release or waive *any* prospective negligence claims on behalf of a child, including the claims envisioned by section 33-44-104(1)–(2).

¶40 As to Crested Butte's first point, we are not convinced that the legislature would have authorized ski area operators to override a longstanding legislative scheme detailing the duties and liabilities of lift operators without an express reference to that statutory scheme. Similarly, we are unconvinced that the legislature would have *tacitly* authorized ski area operators to absolve themselves of their statutory and regulatory duties by private contract, in contravention of longstanding case law establishing that they may not do so.

¶41 As to Crested Butte's second point, Crested Butte overstates the reach of section 13-22-107. In enacting that provision, the legislature made clear that its intent was to supersede our decision in *Cooper v. Aspen Skiing Co.*, 48 P.3d 1229, 1231 (Colo. 2002), which precluded parental waivers of liability for ordinary negligence claims. *See* § 13-22-107(1)(b). We perceive nothing in section 13-22-107, however, indicating a legislative intent to authorize liability waivers that would eradicate the statutory and regulatory duties that the legislature itself codified in the SSA and the PTSA. Nor do we agree that section 13-22-107(4), which precludes parental waivers of a child's claims for willful and wanton conduct, reckless acts or omissions, and gross negligence, reflects a legislative intent to allow parental

18

waivers of statutory or regulatory duties underlying a negligence per se claim because the statute does not expressly mention negligence per se claims. Had the legislature intended such a result, we believe that it would have cited our decision in *Bayer*, as well as our decision in *Cooper*, as animating its enactment. If anything, the fact that the legislature did not cite *Bayer* in its legislative declaration tends to suggest *Bayer*'s continuing vitality, and *Bayer* strongly supports our decision in this case.

¶42 Third, our conclusion effectuates both the legislative policies underlying article 44 and section 13-22-107(3), respectively. Specifically, our determination allows parties injured as a result of lift operators' or attendants' violations of any requirement of article 44 or of any rule promulgated by the Passenger Tramway Safety Board to recover, while at the same time maintaining the enforceability of parental waivers of their children's prospective claims for negligence, when such waivers do not abrogate statutory duties or violate public policy. To conclude otherwise and to limit the SSA's reach to claims for willful, wanton, or reckless conduct, gross negligence, declaratory relief, or regulatory sanctions, as Crested Butte contends, would fail to effectuate the policies and remedies expressly set forth in the SSA.

¶43 For these reasons, we conclude that Miller's negligence per se claim is not barred by the releases that Miller signed and therefore, the district court erred in

dismissing that claim. Accordingly, that claim must be reinstated, although we again note that in so ruling, we express no view as to the ultimate merits of the claim.

### D. Negligence-Highest Duty of Care Claim

¶44 Miller next asserts that the district court improperly applied the factors set forth in *Jones*, 623 P.2d at 376, when it dismissed his negligence-highest duty of care claim. As to this claim, we perceive no error.

¶45 Exculpatory agreements in which parties attempt to insulate themselves from their own negligence warrant close scrutiny, and we therefore must begin any analysis of such agreements by considering whether they are valid and enforceable. *McShane v. Stirling Ranch Prop. Owners Ass'n*, 2017 CO 38, ¶ 20, 393 P.3d 978, 983. To do so, we analyze the four factors that we outlined in *Jones*, 623 P.2d at 376: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language."

¶46 Here, Miller contends that the district court did not properly apply the third and fourth factors. Accordingly, we limit our discussion to those factors.

¶47 With respect to the third factor (i.e., whether the contract was fairly entered into), in *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 784 (Colo. 1989), we

observed that although agreements attempting to exculpate a party from its own negligence are disfavored, such agreements are not necessarily void, as long as one party is not "at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence" (quoting W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser and Keeton on the Law of Torts* § 68, at 482 (5th ed. 1984)).

¶48 Miller contends that the fairness of the release agreements that he signed turns on the fact that Annie was a minor when Miller executed those releases. Specifically, according to Miller, the releases were not fairly entered into because they did not sufficiently inform him that Crested Butte's failure to adhere to statutory requirements could cause injury to Annie. Miller, however, does not dispute that he voluntarily signed the releases in order to allow himself and Annie to participate in a recreational activity. Nor does he dispute that the releases that he signed expressly released claims of lift operator negligence relating to Annie's "using the lifts" or "misloading, entanglements, or falls from ski lifts." He simply appears to assert that the releases were not specific enough to capture the precise scenario at issue here. Miller, however, cites no binding authority requiring that level of specificity, and we have seen none. Accordingly, we conclude that the release agreements at issue sufficiently informed Miller of the types of risks that led to Annie's injuries.

¶49 We likewise cannot say that on the facts presented, Miller was at such an obvious disadvantage in bargaining power that the release agreements put him and Annie at the mercy of Crested Butte's negligence. Recreational activities like skiing entail a number of risks of injury, including risks relating to the use of chair lifts, and those who choose to ski necessarily assume certain risks. Moreover, we have observed that in cases involving non-essential, recreational activities involving the risk of injury, exculpatory agreements like those at issue here did not give the party requiring the agreement a decisive advantage in bargaining strength so as to invalidate such agreements. *See Jones*, 623 P.2d at 377–78 (concluding that because the skydiving services provided by the defendants were not essential services, the defendants did not possess a decisive advantage in bargaining strength over the plaintiff who sought such services, and the exculpatory agreement that the defendants required the plaintiff to sign was not an adhesion contract).

¶50 Accordingly, we conclude that the district court properly determined that the release agreements at issue were fairly entered into for purposes of the third *Jones* factor.

¶51 As to the fourth *Jones* factor (i.e., whether the intention of the parties is expressed in clear and unambiguous language), Miller does not dispute that the release agreements that he signed expressly addressed the risks arising from

"using the lifts" and from "misloading, entanglements, or falls from ski lifts." Relying on *Heil Valley Ranch*, however, he contends that no experienced skier would have anticipated that the releases were intended to cover the specific facts in this case. Again, we are unpersuaded.

¶52 In *Heil Valley Ranch*, we did not require the level of specificity that Miller asserts. Rather, we said only that "[t]he inquiry should be whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." *Heil Valley Ranch*, 784 P.2d at 785. Applying that standard to the facts there before us, we concluded that it was reasonable to interpret the broad language in the release at issue to cover claims based on negligence or breach of warranty, even though the release did not use those specific terms. *Id.*

¶53 Here, the releases that Miller signed expressly stated that the pass holder assumes the risk of "using the lifts" and of "misloading, entanglements, or falls from ski lifts and the negligence of ski area employees." In our view, such language expressed the parties' intentions in clear and unambiguous language and therefore satisfied the fourth *Jones* factor.

¶54 Accordingly, we conclude that the district court did not err in determining that the four *Jones* factors were satisfied in this case and that therefore the releases at issue were enforceable and barred Miller's cause of action for

23

negligence-highest duty of care. As a result, we discern no error in the district court's decision to dismiss that cause of action.

## III. Conclusion

¶55    For these reasons, we conclude that Crested Butte may not absolve itself, by way of private release agreements, of liability for violations of the statutory and regulatory duties on which Miller's negligence per se claim is based. Accordingly, the district court erred in dismissing that claim.

¶56    As for Miller's claim for negligence-highest duty of care, however, we conclude that the district court correctly applied the *Jones* factors and determined that the release agreements that Miller signed were enforceable and barred that claim.

¶57    Accordingly, we make our rule to show cause absolute in part and discharge it in part, and we remand this case to the district court with instructions to reinstate Miller's negligence per se claim and for further proceedings consistent with this opinion. In so ruling, we express no opinion on the merits of Miller's negligence per se claim.

**JUSTICE MÁRQUEZ**, joined by **JUSTICE HART**, concurred in part and dissented in part.

24

JUSTICE MÁRQUEZ, joined by JUSTICE HART, concurring in part and dissenting in part.

¶58 I agree with the majority that the district court properly enforced the waiver signed by Michael D. Miller, as parent and guardian of Annalea Jane Miller, to bar the common law negligence claim Miller brought on his daughter's behalf. But because the district court also properly dismissed Miller's negligence per se claim, I would discharge the rule entirely. Accordingly, I respectfully dissent in part.

## I. The Common Law Doctrine of "Negligence Per Se" Is Simply a Theory of Negligence

¶59 Miller's claim for negligence per se should be dismissed alongside his claim for ordinary negligence. That is because there is no fundamental distinction between the two common law doctrines: "negligence per se" is simply a theory of negligence. To prevail on either claim, a plaintiff must establish the existence of a legal duty or standard of care, breach of that duty or standard of care, injury, and causation. *See Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 929 (Colo. 1997). The only distinction between the two is the source of a defendant's duty or standard of care. At common law, a "defendant's duty is based on the standard of care owed by a reasonable person in the defendant's position." *Scott v. Matlack, Inc.*, 39 P.3d 1160, 1166 (Colo. 2002). But in some contexts, a legislative enactment or administrative regulation defines the legal duty or establishes the applicable standard of care. *Gerrity Oil*, 946 P.2d at 930. This distinction is the "underlying

1

principle of the common law doctrine of negligence per se." *Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 573 (Colo. 2008).

¶60 To sustain an actionable claim of negligence per se, the statute or regulation "must prohibit or require a particular act." *Bauer v. Sw. Denver Mental Health Ctr., Inc.*, 701 P.2d 114, 118 (Colo. App. 1985).[1] Importantly, "[i]f the legislative enactment or regulation defines the legal duty owed by the defendant, then proof of the violation establishes a breach of that duty." *Gerrity Oil*, 946 P.2d at 930; *see also Scott*, 39 P.3d at 1166. Put differently, negligence per se "is not a separate cause of action, but is instead an evidentiary presumption that, if established, constitutes proof of a breach of duty." *Simmons v. Simpson House, Inc.*, 224 F. Supp. 3d 406, 413 (E.D. Pa. 2016).

¶61 But there is nothing otherwise magical or unique about a claim premised on the theory of negligence per se. A plaintiff who has satisfied the elements of duty and breach through a theory of negligence per se is not thereby entitled to automatic recovery — they must still establish injury and causation. *Lombard*, 187 P.3d at 573 ("A party may recover under a claim of negligence per se if it is established that the defendant violated the statutory standard *and* the violation

---

[1] As the majority correctly notes, a plaintiff "must also demonstrate that the statute was intended to protect against the type of injury she suffered and that she is a member of the group of persons the statute was intended to protect." Maj. op. ¶ 27 (quoting *Scott*, 39 P.3d at 1166).

was the proximate cause of the injuries sustained." (emphasis added)); *see also* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 14 cmt. h (Am. L. Inst. 2010) ("Even once the defendant's negligence is established, under other Sections of this Restatement the plaintiff needs to show that the defendant's negligence was a factual cause of the plaintiff's injury and the injury was within the defendant's scope of liability."). In sum, "negligence per se claims often differ very little from their common law cousins: they usually just substitute a common law duty or standard of care with one prescribed by statute and all other elements remain the same." *Espinoza v. Ark. Valley Adventures, LLC*, 809 F.3d 1150, 1154 (10th Cir. 2016).

¶62 As I discuss more fully below, Miller's waiver should operate to bar his "negligence per se" claim—that is, a negligence claim premised on a standard of care established in statute or regulation—just as it bars his ordinary negligence claim. A claim for negligence premised on a statutory or a regulatory standard of care is still just a claim of negligence.

## II. Plaintiff Does Not Allege a Viable Negligence Per Se Claim

¶63 Miller and the majority point to Rule 3.3.2.3.3 of the American National Standards Institute ("ANSI") as the regulation that Crested Butte allegedly breached. But their reliance on this provision does not establish a viable claim of negligence per se.

¶64 Rule 3.3.2.3 sets forth "Duties of operating personnel," and the subrules that follow provide guidance for supervisors (Rule 3.3.2.3.1), operators (Rule 3.3.2.3.2), and attendants (Rule 3.3.2.3.3). Nat'l Ski Areas Ass'n, American National Standard for Passenger Ropeways—Aerial Tramways, Aerial Lifts, Surface Lifts, Tows and Conveyors—Safety Requirements § 3.3.2.3 (Am. Nat'l Standards Inst., Inc. 2017) (known as "ANSI B77.1-2017"). Importantly, Rule 3.3.2.3 sets forth the governing standard of care for all personnel, including lift attendants: "All personnel shall use *reasonable care* while performing their duties." *Id.* (emphasis added). In other words, the Rules require no more than ordinary "reasonable care" (the common law standard of care) when performing the duties set forth in Rule 3.3.2.3.3.

¶65 Moreover, while Rule 3.3.2.3.3 requires attendants to exercise reasonable care in the performance of their duties, it does not require attendants to take—or prohibit them from taking—a *specific* action in response to an unusual occurrence or condition. Instead, as the majority acknowledges, the rule allows an attendant to "choos[e] an appropriate action," which "may include" any of several actions listed, including assisting the passenger, slowing the lift, stopping the lift, or continuing operation and observation. Maj. op. ¶ 30 (quoting ANSI B77.1-2017, § 3.3.2.3.3(b)). But as written, what action (or actions) would be "appropriate" in the exercise of reasonable care under Rule 3.3.2.3.3 will depend on the specifics of

4

a situation. It *may* be true that, in response to an unusual occurrence, the only "appropriate" actions would be to slow or stop the lift. But it is not *necessarily* true that a lift attendant violates the rule by failing to stop or slow the lift, since Rule 3.3.2.3.3 also contemplates the option of continuing operation and observation.

¶66 In short, in choosing to take an "appropriate" action, the Rule ultimately requires nothing more than the exercise of reasonable care. Thus, listing the various actions permitted by Rule 3.3.2.3.3 and concluding that Crested Butte violated the rule, *see* Maj. op. ¶ 33, is insufficient to state a viable claim of negligence per se. *See Bauer*, 701 P.2d at 118 (clarifying that a statute or regulation "must prohibit or require a *particular* act" to sustain an actionable claim of negligence per se (emphasis added)).

### III. The Majority Misreads the Scope of Waivers Permitted by Section 13-22-107, C.R.S. (2023)

¶67 Even assuming Miller's allegations concerning Rule 3.3.2.3.3 state a viable claim of negligence per se, any such claim was waived under the release agreements he signed on behalf of his daughter.

¶68 As relevant here, section 13-22-107(3), C.R.S. (2023), expressly permits a parent to waive their child's prospective claim for "negligence." Such waivers necessarily include claims for "negligence" based on a violation of the Ski Safety Act of 1979 ("SSA") or the Passenger Tramway Safety Board ("PTSB" or the

5

"Board") regulations. *See* § 33-44-104(2), C.R.S. (2023); *Bayer v. Crested Butte Mountain Resort*, 960 P.2d 70, 74 (Colo. 1998). Indeed, the majority correctly notes that a violation of any requirement of the SSA or of any rule promulgated by the PTSB pursuant to section 12-150-105(1)(a), C.R.S. (2023), shall, to the extent such violation causes injury to a person, constitute "negligence."[2] § 33-44-104(2); Maj. op. ¶ 28; *see also Bayer*, 960 P.2d at 78 ("In section 33-44-104(2), the legislature determined that any violation of the [SSA], or Board regulations, would constitute *negligence* for purposes of a tort suit based on an alleged violation." (emphasis added)).

¶69 The General Assembly passed section 13-22-107 in direct response to *Cooper v. Aspen Skiing Co.*, 48 P.3d 1229 (Colo. 2002). In *Cooper*, this court held that, as a matter of public policy, a ski area operator could not enforce a waiver to bar an injured, minor skier's negligence claim for injuries sustained while skiing. *Id.* at 1231. But the legislature expressly rejected this court's holding in *Cooper*, instead declaring it the public policy of Colorado to "encourage the affordability and

---

[2] For this reason, I also disagree with the majority that section 33-44-114, C.R.S. (2023), should lead this court to disregard section 13-22-107. Maj. op. ¶ 38. Section 33-44-114 provides that if any provision of law is inconsistent with the SSA, then the SSA controls. But I see no inconsistency between the SSA, which provides that a violation of any requirement of the Act or any PTSB rule shall constitute "negligence," *see* § 33-44-104(2), and section 13-22-107, which permits parents to waive their child's prospective claims of "negligence."

6

availability of youth activities" in Colorado by allowing a parent to waive their child's "prospective negligence claim" against entities that provide the opportunity to participate in sporting and recreational activities. § 13-22-107(1)(a)(VI), (1)(b). The waivers permitted by section 13-22-107 necessarily include "negligence" claims based on the common law doctrine of negligence per se.

¶70 The majority disagrees, reasoning that "a party cannot discharge its obligation to perform a statutory duty by way of an exculpatory agreement." Maj. op. ¶ 36. But the cases cited by the majority for this proposition are simply inapposite: *Peterman v. State Farm Mutual Automobile Insurance Co.*, 961 P.2d 487 (Colo. 1998), concerned an insurance policy, and *Gonzales v. Industrial Commission*, 740 P.2d 999 (Colo. 1987), concerned unemployment compensation. Neither case involved a negligence claim, let alone a statutory provision such as section 13-22-107 expressly permitting a party to waive such claims.

¶71 The only limitation the General Assembly placed on the waivers permitted by section 13-22-107 concerns claims involving especially egregious conduct — that is, conduct above and beyond ordinary negligence. Specifically, under section 13-22-107(4), parents cannot waive a child's prospective claim for "a willful and wanton act or omission, a reckless act or omission, or a grossly negligent act or omission."

7

¶72    Notably, this list of exclusions in section 13-22-107(4) does not include "negligence per se." But this is no surprise. As discussed, a claim for negligence per se is simply a negligence claim where the standard of care has been set by statute or regulation, rather than by common law. A violation of a statutory or regulatory duty, without more, merely amounts to *negligence*; it does not, in and of itself, constitute "willful and wanton," "reckless," or "grossly" negligent conduct—the especially egregious conduct for which the General Assembly chose not to allow waivers.

¶73    Rather than acknowledging the absence of "negligence per se" claims from the list of exclusions in section 13-22-107(4), the majority instead concludes that the absence of "negligence per se" from section 13-22-107(3) means that the legislature did not intend for parents to be able to waive such claims. But this reasoning fails to appreciate that claims based on a violation of the SSA or PTSB regulations are simply negligence claims based on statutory or regulatory standards of care. *See* § 33-44-104(1), (2) (violation of any SSA requirement or PTSB-adopted regulation shall constitute "negligence"); *Bayer*, 960 P.2d at 78 (observing that in section 33-44-104(2), the legislature determined that a violation of the SSA or Board regulations "would constitute negligence for purposes of a tort suit based on an alleged violation"). Accordingly, the General Assembly had no reason to cite *Bayer* or to list "negligence per se" separately in order for

8

negligence claims based on violations of the SSA or Board regulations to be covered by section 13-22-107(3). *See* Maj. op. ¶ 41. Had the General Assembly wished to exclude negligence per se claims from the waivers permitted under section 13-22-107(3), it would have done so alongside the other exclusions listed in section 13-22-107(4). It did not.

## IV. Conclusion

¶74 Colorado's General Assembly has carefully constructed a regulatory framework responsive to the economic realities of the ski industry. *See Bayer*, 960 P.2d at 72. For example, the SSA broadly immunizes ski area operators against claims arising from the inherent dangers of skiing, § 33-44-109, C.R.S. (2023), while contemplating the availability of negligence claims relating to ski lift operation, §§ 33-44-103 to -104, C.R.S. (2023). But in direct response to *Cooper*—a youth skiing case concerning the enforceability of a parent's release of the child's claims for negligence—the General Assembly observed that as a matter of economic reality, private operators require a measure of protection against lawsuits to provide children with "sporting, recreational, educational, and other activities where certain risks may exist." § 13-22-107(1)(a)(I), (II). Accordingly, the General Assembly expressly allowed parents to waive their children's prospective claims for negligence. § 13-22-107(3). That provision allows parents to waive negligence claims based on either common law or statutory standards of care, while excluding

9

claims related to willful/wanton, reckless, or grossly negligent conduct.[3]  Because

Miller's allegations do not state a viable negligence per se claim, and because such

a claim is waived in any event, I respectfully dissent in part.

---

[3] Accordingly, the district court correctly denied Crested Butte's motion to dismiss as to Miller's gross negligence claim.  Miller may still pursue that avenue of relief. *See* Maj. op. ¶ 13.