25CA0368 Saving Grace v Hudak 03-26-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0368
Mesa County District Court No. 24CV30372
Honorable JenniLynn Everett Lawrence, Judge

---

Saving Grace Family Trust LLC,

Plaintiff-Appellant,

v.

Joy Hudak and Riverside Educational Center, a Colorado Nonprofit
Corporation,

Defendants-Appellees.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE LIPINSKY
Tow and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 26, 2026

---

Brett R. Lilly LLC, Brett R. Lilly, Wheat Ridge, Colorado, for Plaintiff-Appellant

Bechtel & Santo PLLC, Michael C. Santo, Christina M. Harney, Grand
Junction, Colorado, for Defendants-Appellees

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Saving Grace Family Trust, LLC (Saving Grace) appeals the district court's dismissal of its claims against Joy Hudak and Riverside Educational Center (REC) under C.R.C.P. 12(b)(5).  We affirm, albeit on different grounds from those on which the district court premised its dismissal order.

## I.     Background

¶ 2     Saving Grace alleged the following facts in its complaint.  REC, of which Hudak was the executive director, leased commercial space (Unit C) in a building owned by Winters Avenue Building, LLC (Lessor).  James McConnell was Lessor's sole owner.  Saving Grace executed a lease (the lease) for space in the building (Unit D) adjacent to Unit C.

¶ 3     Jestus Brock Wade, Saving Grace's managing member, informed McConnell that Saving Grace was interested in eventually purchasing Unit D.  During their initial conversations regarding Saving Grace's lease of Unit D, Wade "emphasized and re-emphasized" to McConnell that Saving Grace would only lease Unit D if Saving Grace would have the right to purchase it at a later date and that, in light of the nature of Saving Grace's business, it would require specialized alterations and renovations to Unit D.

Nevertheless, the lease did not say that Saving Grace had the right to purchase Unit D in the future and, instead, recited that Saving Grace had no fee interest in it.

¶ 4 The lease said that Saving Grace could make alterations to Unit D, but only with Lessor's written approval; Saving Grace would be responsible for the cost of any such alterations; and Saving Grace would relinquish the alterations at the conclusion of the lease. In addition, the lease said that it memorialized "the entire agreement of the parties" and that any changes to the lease "must be in writing and signed by all parties."

¶ 5 During the lease term, Wade and McConnell periodically discussed Saving Grace's interest in purchasing Unit D. But McConnell "always asked to defer the purchase" until Lessor had subdivided the units in the building, established a governing body for those units, and obtained an appraisal of the building. In the meantime, McConnell approved significant structural alterations to Unit D tailored to Saving Grace's needs.

¶ 6 After Lessor obtained an appraisal of the building, Saving Grace's counsel sent McConnell a draft letter of intent (LOI) setting

forth proposed terms for Saving Grace's purchase of Unit D. The draft LOI said in relevant part,

> If this Letter of Intent sets forth the terms on which you are willing to pursue the Purchase Agreement, and related documentation, please sign a copy of this LOI and return it . . . . Execution of this letter by both parties will indicate their desire that the formal [Purchase] Agreement be prepared . . . .

¶ 7     Lessor never signed the LOI, however. In response to the draft LOI, McConnell told Saving Grace's counsel that "I have reached out to [Wade] and as soon as we can get together I will share a plan." McConnell later showed Wade and Wade's business partner the appraisal and asked them to follow up with him in January 2023.

¶ 8     In January 2023, Lessor and REC entered into a contract for REC's purchase of Unit C. In addition, Lessor agreed to donate Unit D to REC, a 501(c)(3) nonprofit organization, after REC closed on its purchase of Unit C.

¶ 9     One month later, McConnell informed Wade that Saving Grace could not purchase Unit D. He explained to Wade that REC was purchasing Unit C and that REC "refused to buy [Unit C] if [Lessor] did not also donate [Unit D]." Hudak "drafted an email for [McConnell] to send to Wade, informing him that [Lessor] would be

3

transferring [Unit D] to REC and that future lease payments by [Saving Grace] should be sent to REC."

¶ 10    In March 2024, REC informed Saving Grace that the lease would not be renewed and that Saving Grace would need to vacate Unit D at the end of the year.  As a result, Saving Grace was "forced to relocate at a tremendous financial cost and to a location that will be much less efficient and cost-effective for [Saving Grace's] employees, vendors and customers."  In its complaint, Saving Grace pleaded intentional interference with prospective contractual relations and unjust enrichment claims.  Among other allegations, Saving Grace said that Hudak and McConnell (who were both married to other people at the time) were involved in an adulterous relationship that Hudak exploited to influence and induce Lessor, through McConnell, to donate Unit D to REC instead of selling it to Saving Grace.

¶ 11    Hudak and REC filed a motion to dismiss Saving Grace's complaint, asserting, among other arguments, that Saving Grace failed to state claims upon which relief could be granted under C.R.C.P. 12(b)(5) and that REC's actions were "privileged" because REC and Saving Grace were engaged in "legitimate business

4

competition" for ownership of Unit D. The district court granted Hudak and REC's motion, concluding that Saving Grace failed "to establish that any agreement regarding the sale of [Unit D] was ever reached" with Lessor and that Saving Grace "alleged no facts that support a theory that [REC] was in any way unjustly enriched by any unprivileged action" REC took.

## II. Analysis

### A. The District Court Did Not Err by Dismissing Saving Grace's Claim for Intentional Interference with Prospective Contractual Relations

¶ 12    Saving Grace first contends that the district court erred by dismissing its claim for intentional interference with prospective contractual relations. We disagree.

#### 1. Standard of Review

¶ 13    "We review de novo a district court's order granting a C.R.C.P. 12(b)(5) motion to dismiss." *Miller v. Crested Butte, LLC*, 2024 CO 30, ¶ 21, 549 P.3d 228, 233. In evaluating such a motion, "a court may consider only the facts alleged in the complaint, documents attached as exhibits to or referenced in the complaint, and matters of which the court may take judicial notice, such as certain public records." *802 E. Cooper, LLC v. Z-GKids, LLC*, 2023

5

COA 48, ¶ 12, 535 P.3d 101, 104. "In conducting this review, we apply the same standards as the district court, and we accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Miller,* ¶ 21, 549 P.3d at 233.

¶ 14     "In addition, we have adopted a 'plausibility' standard for determining such motions. In order to survive a motion to dismiss under this standard, a plaintiff must allege a plausible claim for relief." *Id.* at ¶ 22, 549 P.3d at 234 (citation omitted). "Under the 'plausibility standard' for determining whether a plaintiff has stated a claim upon which relief can be granted, 'the factual allegations of the complaint must be enough to raise a right to relief "above the speculative level"' and 'state a claim for relief that is plausible on its face.'" *802 E. Cooper*, ¶ 11, 535 P.3d at 104 (quoting *Warne v. Hall*, 2016 CO 50, ¶¶ 1, 9, 373 P.3d 588, 589, 591).

### 2.     The Law of Intentional Interference with Prospective Contractual Relations

¶ 15     The tort of interference with existing or prospective contractual relations can take the form of "interfere[nce] with a prospective business relation between a plaintiff and a third party." *Harris*

6

*Grp., Inc. v. Robinson,* 209 P.3d 1188, 1195 (Colo. App. 2009);

Restatement (Second) of Torts § 766B (A.L.I. 1979).

> One who intentionally *and improperly* interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (emphasis added).

¶ 16    Thus, to plead a plausible tortious interference claim, the plaintiff must allege that the interference was both intentional and improper.  *See id.* at cmt. a.  But when a plaintiff asserts an intentional interference claim against a competitor, the plaintiff must not only plead intentional and improper interference but must also sufficiently allege that the competitor employed "wrongful means" to do so.  Section 768 says,

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable

7

at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ *wrongful means* and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

*Id.* § 768(1) (emphasis added). Section 768 "applies whether the actor and the person harmed are competing as sellers or buyers or in any other way, and regardless of the plane on which they compete." *Id.* at cmt. c.

### 3. Saving Grace's Allegations

¶ 17   Saving Grace alleged that Hudak, who, as noted above, was REC's executive director, intentionally and improperly interfered with Saving Grace's prospective contractual relationship with Lessor by exploiting her allegedly improper relationship with McConnell. Hudak and REC argued in their motion to dismiss that the interference claim failed because Saving Grace and REC were engaged in legitimate business competition for ownership of the

8

same real property interest — Unit D — and Saving Grace did not allege actionable wrongful means.

¶ 18    To support its claim that the interference was improper and wrongful, Saving Grace alleged the following:

- On numerous occasions, Hudak's behavior toward McConnell demonstrated Hudak's "improper[] and unethical[] involve[ment]" with him.

- Hudak's adulterous relationship with McConnell interfered with Saving Grace's prospective economic and contractual relationship with Lessor — specifically, Saving Grace's prospective purchase of Unit D from Lessor.

- Hudak asked McConnell for personal favors and gifts.

- Although Hudak and REC had a "legal obligation to protect McConnell and [Saving Grace] from undue influence or other pressure on McConnell," Hudak's alleged undue influence on McConnell "interfered with [Lessor's] economic relationship with [Saving Grace]."

- Because of REC's nonprofit status, Hudak and REC were subject to certain fundraising guidelines, specifically the

Association of Fundraising Professionals' Code of Ethical Standards, the Colorado Nonprofit Association's Principles & Practices for Nonprofit Excellence in Colorado, and the Internal Revenue Service (IRS) rules governing charities and nonprofits.

- Hudak and REC's "interference was improper by virtue of [Hudak's] use of unlawful and wrongful tactics" to persuade McConnell to cause Lessor to make donations to her (in the form of "favors and gifts of money") and REC.

### 4. Saving Grace Competed with REC for Ownership of Unit D

¶ 19 The allegations in Saving Grace's complaint show that it competed with REC for ownership of Unit D, and thus, Restatement section 768 applies. *See id.* In its opening brief, Saving Grace did not argue that REC was not its competitor. Rather, Saving Grace conceded that "[c]ompetitors are permitted to exert economic pressure over one another and will not be liable for tortious interference with business expectancy so long as the four factors" in Restatement section 768 are satisfied. To overcome the heightened

requirement of section 768, Saving Grace argued it sufficiently pleaded that Hudak and REC engaged in wrongful means. *See id.* § 768(b). We are unpersuaded.

¶ 20 (Before we proceed further, we note that section 768 applies equally to Saving Grace's claims against Hudak and its claims against REC because Saving Grace alleged that, at all times relevant to the case, Hudak was acting as REC's agent. Saving Grace bases its claims on Hudak's conduct toward McConnell to induce him, as an owner of Lessor, to cause Lessor to donate Unit D to Hudak's employer, REC. Accordingly, Saving Grace's claims against Hudak cannot be disentangled from its claims against REC, and are subject to section 768.)

### 5. Saving Grace Failed to Plead that Hudak and REC Employed Wrongful Means

¶ 21 Saving Grace did not allege sufficient facts to state a plausible claim that Hudak and REC employed wrongful means to interfere with Saving Grace's alleged prospective contract with Lessor for the purchase of Unit D.

¶ 22 Comment e to section 768 says that, to be actionable, the defendant's wrongful means must rise to the level of "physical

11

violence, fraud, civil suits and criminal prosecutions." The wrongful means are therefore limited to "conduct which is itself capable of forming the basis for liability." *Harris Grp.*, 209 P.3d at 1197.

¶ 23    In its opening brief, Saving Grace argues that it pleaded the following wrongful means:

- REC "fail[ed] to properly disclose the financial interactions between [Lessor] and . . . Hudak and REC."

- McConnell made an "unlawful payment" to Hudak, referring to the bonus McConnell purportedly paid Hudak for her role in Lessor's sale of "the Winters Avenue Building." (Saving Grace did not allege any facts suggesting that this payment was unlawful, however.)

- REC prepared a "grant application" and fundraising documents containing "misleading statements and omissions."

- REC and Hudak violated "IRS rules for charities and nonprofit organizations."

¶ 24    In support of these allegations, Saving Grace argued that section 7-128-501, C.R.S. 2025, provides that a nonprofit entity's "conflicting interest transaction" can "give rise to an award of

12

damages or other sanctions for failure to properly disclose the conflicting interest transaction which involves a director of the nonprofit corporation or a party related to a director or an entity in which a director has a financial interest." Saving Grace further argued that the statute imposes on "a director of a non-profit . . . a duty of good faith in the discharge of their obligations."

¶ 25 Regardless of these assertions, however, Saving Grace's claims all rest on its allegation that Hudak engaged in an extramarital affair with McConnell. Saving Grace even suggested in its opening brief that Hudak become involved with McConnell "solely to cause harm to [Saving Grace]," although Saving Grace did not make this allegation in its complaint. Notably, Saving Grace did not allege any other link between REC's efforts to raise funds for its purchase of Unit C and the alleged tortious interference.

¶ 26 To the extent Saving Grace alleges REC failed to disclose "personal favors and gifts of money" that McConnell gave Hudak, those allegations, too, are premised on their alleged adulterous relationship. Saving Grace did not plead that McConnell's contributions to REC "for various purposes and in various amounts" violated any fundraising rules or guidelines apart from

the implication they were only made because of McConnell and Hudak's extramarital relationship. As Saving Grace said in its opening brief:

> Hudak's personal and private involvement and relationship with [McConnell] was with knowledge of and disregard to the rights and plan of [Saving Grace] to purchase [Unit D]. . . . Hudak's personal involvement with [McConnell] involved improper and unethical physical affection, and was used as means to interfere with [Saving Grace's] expected economic advantage by making [Lessor] donate [Unit D] to . . . REC as part of the purchase of [Unit C]. This conduct violate[d] the prohibition against exploiting any relationship with a donor for the benefit of the members or the members' organizations. . . . Hudak's improper relationship with [McConnell] was used by Hudak to seek to cause harm to [Saving Grace].

This argument is consistent with Saving Grace's allegations in its complaint, as noted above.

¶ 27    As a matter of law, exploitation of an extramarital relationship is not the type of "independently actionable conduct," *Harris Grp.*, 209 P.3d at 1198 (quoting *DP-Tek, Inc. v. AT&T Glob. Info. Sols. Co.*, 100 F.3d 828, 833-35 (10th Cir. 1996)), that can "establish[] the basis of a defendant's liability," *Harris Grp.*, 209 P.3d at 1198. Such relationships are not akin to physical violence, fraud, civil

14

suits, and criminal prosecutions. *See id.*; Restatement (Second) of Torts § 768. Nor are such relationships capable of forming the basis for liability because Colorado long ago abolished civil actions for things like alienation of affections and seduction. *See* § 13-20-202, C.R.S. 2025. (This type of statute is known as a "heartbalm statute" — "[a] state law that abolishes the rights of action for monetary damages as solace for the emotional trauma occasioned by a loss of love and relationship." Black's Law Dictionary 864 (12th ed. 2024)). Furthermore, when a tortious interference claim arises from a *prospective* contractual relationship, the plaintiff must plead "more blameworthy means" than if the claim involved an existing contract. *DP-Tek*, 100 F.3d at 834.

¶ 28    For these reasons, Saving Grace could not plead a plausible tortious interference claim premised on Hudak and REC's exploitation of Hudak's extramarital relationship with McConnell.

¶ 29    In light of this determination, we need not reach Hudak and REC's argument that Saving Grace also failed to plausibly allege a "reasonable likelihood or reasonable probability" that a contract

would have resulted between Saving Grace and Lessor for Saving Grace's purchase of Unit D.

###### B. The District Court Did Not Err by Dismissing Saving Grace's Unjust Enrichment Claim

¶ 30 We next turn to the district court's ruling that Saving Grace "did not allege unjust enrichment by any unprivileged action [REC and Hudak] took." In arguing that the district court erred by dismissing Saving Grace's claim for unjust enrichment, Saving Grace conflates its intentional interference and unjust enrichment claims. Saving Grace asserts that it pleaded a plausible unjust enrichment claim because, as discussed above, it sufficiently alleged that Hudak and REC engaged in the wrongful means required to overcome the "privilege of competition" affirmative defense in Restatement section 768. Saving Grace further contends that the district court should not have resolved REC's competition privilege affirmative defense on a motion to dismiss. We disagree.

###### 1. The Elements of Unjust Enrichment

¶ 31 "Unjust enrichment . . . is a form of quasi-contract or contract implied-in-law that does not depend on a promise or privity between the parties." *Bd. of Governors of Colo. State Univ. v. Alderman*, 2025

CO 9, ¶ 35, 563 P.3d 1205, 1213. "The test for recovery under an unjust enrichment theory requires a plaintiff to show that (1) at the plaintiff's expense (2) the defendant received a benefit (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying." *Id.*

### 2. Saving Grace Failed to Plead the Elements of Unjust Enrichment

¶ 32    Saving Grace argues that a court cannot adjudicate the affirmative defense of privilege on a motion to dismiss. We need not reach this issue, however, because even if none of REC's actions were privileged, Saving Grace's unjust enrichment allegations still fell short of satisfying the *Warne* pleading standard.

¶ 33    As we understand this claim, Saving Grace alleges that its reliance on McConnell's conduct "gave rise to certain legal rights" that it could assert against McConnell, and that its decision "not to initiate legal action" against McConnell "conferred a benefit" on Hudak and REC that they would not have received if Saving Grace had purchased Unit D. It is not clear to us, however, how Hudak and REC could have obtained a benefit because Saving Grace sued

17

them but not McConnell.  Saving Grace does not cite, nor are we aware of, any Colorado legal authority supporting this theory.

¶ 34    Moreover, Saving Grace makes the conclusory assertion that "none" of the general elements of an unjust enrichment claim "are in question in this case."  But Saving Grace was required, and failed, to allege specific facts that, on their face, plausibly showed that Saving Grace satisfied each of the three elements of unjust enrichment.  *See 802 E. Cooper*, ¶ 11, 535 P.3d at 104; *Alderman*, ¶ 35, 563 P.3d at 1213.

¶ 35    Even viewing the allegations in the complaint as true and in the light most favorable to Saving Grace, *see Miller*, ¶ 21, 549 P.3d at 233, Saving Grace's unjust enrichment allegations are insufficient.  Those allegations consisted of nothing more than conclusory statements that Hudak and REC were "aware of the benefit conferred upon them," they were "aware that they [had] been unjustly enriched," and "it would be inequitable and unfair" for them to "retain the benefits of owning" of Unit D.  *See 802 E. Cooper*, ¶ 12, 535 P.3d at 105 ("[W]e are not required to accept as true legal conclusions that are couched as factual allegations."

(quoting *Giduck v. Niblett*, 2014 COA 86, ¶ 34, 408 P.3d 856, 868)). (And, of course, Hudak never owned Unit D.)

¶ 36    In sum, we hold that the district court did not err by dismissing Saving Grace's complaint under C.R.C.P. 12(b)(5), although we base our opinion on different grounds from those underlying the district court's dismissal order.

## C.    Attorney Fees

¶ 37    Saving Grace withdrew its contention that the district court erred by awarding attorney fees to Hudak and REC, acknowledging that its attorney fee argument would be premature until the court set the amount of such fees.  The district court subsequently denied Hudak and REC's request for attorney fees because, according to the court, they did not prove the reasonableness of the hourly rate for their requested attorney fees.  Hudak and REC filed a separate appeal of the court's order declining to award attorney fees to them. Thus, we do not address attorney fees in this appeal.

## III.    Disposition

¶ 38    The judgment is affirmed.

JUDGE TOW and JUDGE BERGER concur.